**In re APACHE TRADING GROUP, INC., Apache Performance Brokerage, Inc., and Juan Almeida, Alleged Debtors.**

Bankruptcy Nos. 95–11127–BKC–AJC, 95–11128–BKC–AJC and 95– 11129–BKC–AJC.

United States Bankruptcy Court, S.D. Florida.

July 8, 1997.

Herbert Stettin, Stettin & Coleman, P.A., David Goldstein, Miami, FL, for Alleged Debtors.

John Genovese, David Cimo, Kelley, Drye & Warren, Miami, FL, for Petitioning Creditors.

### THE SEIGE OF FORT APACHE

A. JAY CRISTOL, Chief Judge.

This matter came on for trial on August 19 and 21, 1996, September 16 and 17, 1996, October 23, 24, and 25, 1996, and November 21 and 22, 1996, upon the involuntary petition filed under 11 U.S.C. § 303 by alleged creditors, Arthur W. Balogh, Jr. ("Balogh"), James R. Bell ("Bell"), Mike Britton, Elizabeth G. Andrus, the Chapter 7

Trustee for the estate of Marine Turbine Technologies, Inc. ("Andrus"), Joseph P. Handy ("Handy"), Ted McIntyre ("McIntyre") and Ronald C. Meixner ("Meixner") (collectively the "petitioning creditors") against alleged involuntary debtors, Apache Trading Group, Inc., Apache Performance Brokerage, Inc., ("Apache" or "Fort Apache") and Juan Almeida ("Almeida") (collectively the "alleged debtors"). The involuntary petition was filed on March 13, 1995. The trial concluded on December 26, 1996, at 4:15 p.m. Counsel were allowed until January 24, 1997 to submit proposed Findings of Fact and Conclusions of Law and Final Judgments. The Court scheduled final arguments for January 29, 1997 and upon request, reset final arguments to February 26, 1997. The burden of proof is upon the petitioning creditors to prove that the alleged debtors are generally not paying their debts as they become due unless such debts are the subject of bona fide dispute. 11 U.S.C. § 303(b)(1). The burden of proving the debts are subject to a bona fide dispute is upon the alleged debtors.

The Court takes judicial notice that the Apache marina area is the heart and nerve center of the "go fast" or "fast boat" industry and was the stomping grounds of Donald Aronow, the legendary father of fast boats who was murdered in a gangland style hit on February 3, 1987, just a few meters from Fort Apache on Thunderboat Boulevard. The transcript of this trial could well be the sequel to *Blue Thunder*,[1] the book about Donald Aronow, by Thomas Burdick and Charlene Mitchell. Indeed, after the forfeiture of Fort Apache marina to the U.S. Government, under drug laws, it was acquired and operated by the cast of characters in this scenario.

And what a tale. The testimony is all about Russian KA–32 heavy-lift helicopters equipped, like every normal civilian helicopter, with FLAIR (Forward Looking Infra-Red scanning devices). They were acquired in the former Soviet Union and transported on an Antonov An–124 Transport to Colombia, the coffee capital of the Western Hemisphere. The FLAIR was no doubt needed in case Juan Valdez became separated from his donkey and the donkey needed to be located. The testimony also concerns Bell Ranger jet helicopters, just like the ones Don Aronow used to flit about in, and Cigarette racing boats with turbo jet engines that are valued between $177,000 and $512,000, depending on whose appraiser seems more credible.[2] There was other testimony of customers with a need for boats that can go 600 miles at 60 miles per hour without refueling—obviously sport fishermen. At the center of this conflict is Juan Almeida. One must wonder if he is indeed a purveyor of toys for the rich and famous or a quartermaster supplying logistical support for the other side of the war on drugs.[3] Counsel for the petitioning creditors and counsel for the respondents did excellent jobs of presenting their clients' sides of this dispute.

The Court commends counsel for the petitioning creditors, John Genovese and David Cimo and counsel for the alleged debtor, Herbert E. Stettin for their highly professional preparation and presentation of their

---

1. Simon and Schuster, New York: 1990.

2. The Petitioning Creditors' expert, Jay Castline, a marine surveyor from Hollywood, Florida, appeared credible and testified to a range of values for the three boats (or hulls) and the two trailers with a low end total value of about $177,000.00 in March 1995. Alleged Debtors' expert, John Drew Quederas, a surveyor/engineer also appeared credible and testified more fully about each boat or hull with the trailers included giving values ranging from $479,000 to $512,000.00. The Court feels each expert leaned as far as he could to support the case of the party who called and compensated him. While the bottom figure appears too low, it is not necessary to agree with the top figure but only to conclude that the values are at least equal to, or in excess

of, the debt due to Mr. Meixner, i.e., $323,585.00.

3. The Court is aware that in early February 1997, Juan Almeida was indicted for an alleged scheme to haul drugs in a Russian nuclear submarine. The Assistant U.S. Attorney was quoted in the press as saying about the case: "It certainly is full of intrigue; these guys were into just about everything." After his arrest, Mr. Almeida was released on a $400,000 corporate surety and a $3,000,000 personal surety.

This was not the first submarine in Almeida's life. He previously purchased a 16 passenger submarine, allegedly worth $1.2 million, while he operated Fort Apache.

respective client's cases. The Court also notes that counsel demonstrated civility to each other and opposing litigants during this lengthy conflict in the finest tradition of the legal profession. It is unfortunate that such civility is absent from many of today's contested proceedings. Counsel on both sides in this case demonstrated that a client may have zealous representation without the abandonment of civility and professionalism.

The record is replete with undisputed testimony of huge amounts of cash being wired or transported and distributed by respondent, Mr. Almeida and petitioners, Mr. Bell and Mr. Balogh. Mr. Bell and Mr. Balogh are a pair of interesting, charming, smooth rouges who lived in the world of Fort Apache.[4]

Part of the tale was told by a witness, Ludwig Lyosha "Tarzan" Fainberg, a man born in Russia who speaks five languages fluently and, at the time of his testimony, operated "Porky's, Inc.," an adult entertainment establishment in Hialeah.[5]

The Court need not consider and decide if this is a dispute among former friends or a falling out among thieves. The items the Court considered in arriving at its decision include more than 2,000 pages of testimony and argument, approximately 150 exhibits, and the argument of counsel. The Court's findings of fact and conclusions of law are as follows:

Section 303(b) of the Bankruptcy Code, provides that an involuntary case against a person (defined to include an individual, partnership, and a corporation, § 101(41)), is commenced by three or more entities each holding a claim against the involuntary debtor not contingent as to liability or the subject of a bona fide dispute, if the claims aggregate at least $10,000.00 more than the value of any collateral held by the petitioners. Relief against the involuntary debtor may be ordered only if the petitioners prove the requirements of § 303(b) and the debtor is generally not paying his debts as they come due, unless those debts are the subject of a bona fide dispute.

The evidence reflects that Almeida was in the business of selling expensive high-performance cars, exotic boats and unusual aircraft for a number of years. His income was never fixed as to amount or paid on a scheduled basis because he was paid commissions, usually due when the transaction was completed. He claims that he was successful in his business principally because he excelled in bringing buyers and sellers of these specialized products together. Of necessity, Almeida paid his bills when he received payment from the transactions he was brokering.

In 1988, Almeida met Balogh, who was then acting as receiver of the Fort Apache Marina in Dade County, Florida, for the United States Marshals Service in a forfeiture proceeding. Balogh testified that in an effort to keep his job as manager, he provided confidential financial and operational information concerning the marina to Almeida and his investment partners to enable them to make the best bid for the property. Balogh testified he did this with the permission of the United States Marshals Service and the late District Judge Aronovitz. The Court does not believe that the United States Marshals Service or Judge Aronovitz approved Mr. Balogh's breach of his fiduciary duty.

Almeida and his business partners, Fernando Birbragher ("Birbragher") and Joe Rubert, were the successful bidders and their company, Fort Apache Marina, Inc., became the owners of the marina. They hired Balogh as the manager and he operated the property until he was discharged in 1990. He returned again in 1992, at first to market the sale of the marina, and then as manager until May, 1993, when the marina was leased to a third party operator. The evidence is undisputed that during his two terms as manager, Balogh was in control of the business. He operated its daily affairs, kept the books, and wrote the checks. It is also un-

---

**4.** Described by Mr. Balogh as "the Ether Palace", a place where he and Almeida would deal with customers as follows: "snow blind'em, eye wash'em, and take their cake."

**5.** Mr. Fainberg was indicted along with Mr. Almeida on the nuclear submarine caper.

disputed that the marina never made money during the time it was operated by Fort Apache Marina, Inc. Testimony as to the reasons for the losses and how those losses were funded is in sharp conflict. Regardless of why and how, the financial problems of the marina impacted all of the parties in these proceedings.

Fort Apache Performance Brokerage, Inc. was a corporation owned by Almeida and Birbragher and set up to broker the sale of boats at the marina. By all accounts it was financially successful. Although Balogh was not an employee of this company, he assisted its activities and he supervised its finances. At times, some of its income was used to pay for Fort Apache Marina's obligations.

Initially, Almeida met Meixner and Bell as boating customers at the marina. Meixner was a wealthy German citizen who had a home in Florida. Bell was involved in professional auto racing. Both men became active in the affairs of the alleged corporate debtors. Meixner was a money lender, both directly and through his company, Acme Rocket, Inc., and Bell was involved in obtaining and completing the sale of boats, cars, helicopters, and other products for both Fort Apache Performance Brokerage, Inc. and Apache Trading Group, Inc.

Mr. Bell testified that he had over 20 deals with Mr. Almeida. There was never a written contract and Bell said he understood that he would receive reimbursement of expenses and a commission although the quantification of the commission was never established with any precision.

Bell said he loaned Almeida $70,000 in connection with a 38 foot Cigarette boat deal in 1993 and he was not repaid. There was no written agreement and no documents. Since he was not repaid the $70,000, Bell apparently thought it prudent to lend another $50,000 on a 48 foot catamaran deal. This $50,000, he testified, also was not repaid. Under these circumstances, it seemed only natural that Bell should advance another $75,000 of his own money on the Russian KA–32 helicopter deal. He testified he got $100,000 cash from Almeida on this deal. In addition, Bell testified that he was the only person with signature authority on a Swiss bank account that, over time, contained in excess of one million dollars. Bell testified that on the Russian helicopter deal, a spare engine which cost $22,000, did not make it aboard the Antonov An–124 with the helicopters and that the Russian Mafia wanted $60,000 for the $22,000 engine and certain documents. He then said the ransom was raised to $120,-000, and that the ensuing Russian police sting resulted in the arrest of 16 people. Unfortunately, according to Bell, the Russian police kept the engine and the documents as evidence.

Bell said his personal expenses were in excess of $200,000 and that Almeida reimbursed him $50,000 or $60,000. Next, Bell said he concluded the re-registration of the helicopters by paying bribes. He said the re-registration costs were $150,000 and he obtained the documents. He said he tried to hold the re-registration documents pending his being paid, but Almeida and his friends (unidentified) got mad. Therefore, Bell turned over the documents without payment.

Bell admitted on cross examination that he bribed many people, including (spelling is phonetic) Fadin, Chubichov, Petrov, Gorlov - $75,000, and the Ambassador of Colombia.

He also admitted that he received $50,000 to buy insurance which cost $28,000 and that he kept the $22,000 change. He claimed he was owed money for a Ferrari Testarossa, but the evidence revealed (Exhibit 77) that his wife received a check for this item. He also admitted marking an invoice "paid in cash" when it had not been paid in order to further an insurance fraud. Mr. Bell is not credible and cannot be believed. His testimony was not sufficient to establish any debt from the alleged debtors to him.

At approximately the time the marina operations were leased to a third party, Almeida, Meixner, Bell, Balogh, and several other individuals set up Apache Trading Group, Inc., intending that the company buy and distribute motorcycles, helicopters, and other products from the former Soviet Union. Apache Trading Group, Inc. occupied offices at the marina which were specifically built for it. In furtherance of its business, Apache Trading Group, Inc. began actively seeking

business opportunities and engaged in sales promotions.

Up to the latter part of 1993, Almeida worked closely with Meixner, Bell, and Balogh in Apache Trading Group, Inc. and Fort Apache Brokerage Performance, Inc. They participated in a number of business transactions involving the purchase and sale of boats, cars and helicopters. Common to all of these dealings was Almeida's ability to find a purchaser for the product, Meixner providing the financing, Balogh managing the marina, Fort Apache Brokerage Performance, Inc. and Apache Trading Group, Inc., and Bell locating and handling the products to be sold through his technical expertise and follow-through. All of this changed in early 1994 when Bell, Balogh, and Meixner decided to eliminate Almeida and the Apache companies from the business opportunities obtained up to that time. A clear example of this scheme is shown in a contract between Apache Trading Group, Inc. and the Minsk Motorcycle and Bicycle Factory in Belarus for the purchase of more than 1,400 motorcycles. Alleged Debtors' Exhibit 19 at trial is a November 24, 1993 letter by Balogh, signed as president of Apache Trading Group, Inc., to the motorcycle factory confirming that Hector Santana was acting for Apache Trading Group, Inc. to arrange for the purchase of the motorcycles. Three weeks later, Santana signed two contracts on behalf of Apache Trading Group, Inc. to buy 1,455 motorcycles. The motorcycles were shipped to Panama for sale throughout Central and South America pursuant to bills of lading listing Apache Trading Group, Inc. as the consignee. The motorcycles were received in Panama in the name of Minsk Of The Americas, a partnership secretly set up by Meixner, Bell, and Balogh to take over the motorcycle purchase and divide the sales proceeds with Santana. Meixner, Bell, Balogh, and Santana simply eliminated Apache Trading Group, Inc. and Almeida from the deal. According to Bell and Balogh, this transaction involving Minsk Of The Americas was meant to be a secret from Almeida. The new partnership borrowed $160,000.00 from Meixner's company, Acme Rocket, Inc., to pay for freight, customs duties, and storage charges. They never paid the Minsk factory for the motorcycles and, apparently, never intended to do so. Balogh set up bank accounts in Panama, Mexico, and Florida to handle the transaction.

Bell and Balogh's testimony as to their joint venture with Santana was evasive and misleading. Despite never having done business with Santana before, they had no written agreement as to their joint venture; they could not explain what their commission arrangement was; they had few, if any, records as to how they spent the $160,000.00; and Meixner never attempted to obtain repayment to Acme Rocket, Inc. for its loans despite defaulted promissory notes signed by Bell and Balogh. Bell and Balogh testified there were never any profits in this joint venture because the motorcycles were either sold to purchasers who refused to pay, or they simply disappeared. In any event, all the motorcycles are gone, strangely enough, for no money realized, and Apache Trading Group, Inc. has been deprived of its rights and possibly has some liability to the Minsk Motorcycle and Bicycle Factory in Belarus.

The connection between Meixner, Bell, and Balogh did not end with the Minsk Motorcycle deal. Their claims as creditors of the three involuntary debtors and their joinder in these proceedings are equally suspect. Meixner, Bell and Balogh signed the three petitions without ever filling in the amount of their claims. When confronted with this, Bell and Balogh blamed their lawyer, although both acknowledged having read the petitions beforehand and of being aware of their obligation to give truthful, complete information. The excuse for this lapse does not make sense in light of the fact the petitions were signed February 21, 1995 but the cases were not filed until March 13, 1995; the amounts claimed as debts in the petitions were never amended; and their trial testimony differed from the amounts originally claimed to be due. Their testimony concerning the amount of their claims was filled with inconsistencies, unexplained differences, and outright misstatements. In addition, neither Bell nor Balogh has paid for any of the services of their attorneys. Apparently, Meixner is to be responsible for this. Meixner did not appear at trial. He testified only

through a deposition taken by the alleged debtors' counsel in May, 1995.

A common theme throughout the trial was the petitioners' attempt to prove Almeida was the alter ego of Fort Apache Performance Brokerage, Inc. and Apache Trading Group, Inc. during the period prior to the March, 1995 filing. No credible evidence was introduced in support of the alter ego theory and petitioners' own witness, accountant J.P. Handy, testified that although there were advances of funds between the various entities, there was no commingling, and each entity maintained separate records and accounts. Handy confirmed that each time funds were transferred, the transfer was reflected on the books. This became a critical fact for several reasons. First, despite Meixner's claim in the involuntary petitions that Almeida owed him over $65,000.00, Fort Apache Performance Brokerage, Inc. owed him $100,000.00, and Apache Trading Group, Inc. owed him $65,000, the sole trustworthy evidence of the debt is a Stipulation of Settlement which reflects that only Almeida was obligated to pay Meixner money. There was simply no credible evidence at trial that Fort Apache Performance Brokerage, Inc. and Apache Trading Group, Inc. were obligated to Meixner, and no proof as to the amounts claimed. In addition, Meixner's debt is secured by a lien upon three Cigarette boats and two trailers. The more credible expert testimony at trial proved that the value of this collateral at least equalled and probably exceeded the debt due Meixner. Nevertheless, even though Meixner is an oversecured creditor, this would not disqualify him from serving as one of the creditors in the Almeida involuntary case. The question remaining then, is whether there are at least two other creditors of Almeida holding claims of at least $10,000.00 who are competent petitioners in these proceedings.

Mike Britton was involved in this case by virtue of his Notice Of Joinder In Involuntary Petitions which was filed by Meixner and Acme Rocket, Inc. as part of their Notice Of Filing Notice Of Joinder In Involuntary Petitions which was filed on July 3, 1996. The Notice of Joinder contained only a photocopy of Mr. Britton's signature and was not signed by Mr. Peter J. Yanowitch or Mr. Gregory A. Martin, even though signature blocks were provided for them. This would pose a problem were it not for Meixner's and Acme Rocket's Notice Of Withdrawal Of Notice Of Filing Notice Of Joinder In Involuntary Petitions which was filed on August 8, 1996, ending Mr. Britton's involvement in this case.

The Court finds that none of the creditors who did file joinders (Handy, McIntyre, and Andrus) in these proceedings are creditors of Juan Almeida, hence the issue becomes whether Bell and Balogh, the only two remaining petitioners, have proven they hold claims against the alleged corporate debtors aggregating at least $10,000.00, not contingent as to liability or the subject of bona fide disputes.

The claims of Bell and Balogh were the focus of most of the contested trial testimony. Both claims have similar proof problems involving the lack of contemporaneous record keeping and the amount of the claims, which changed over time. Neither Bell nor Balogh had any credible reasons for the different amounts claimed at various stages in the litigation. Serious questions also arose regarding their inconsistent testimony about credit for payments received, the party actually liable for the claim and the existence of the claims. The Court carefully listened to these witnesses during the trial, noting their demeanor, their motives, their lack of candor, their use of catch phrases to cover up serious misconduct, their repeated admissions of resorting to unethical and unacceptable business practices during the pre-petition period in question; and, most importantly, their apparent willingness to say or do anything to achieve their goals, regardless of the truth or morality of their actions.

This willingness is amply demonstrated by Bell's and Balogh's own testimony. Bell testified, as indicated above, that in the process of trying to procure the Russian heavy lift helicopters, he repeatedly bribed people to get what he wanted. Similarly, Balogh testified that he breached his fiduciary duty because the late Judge Aronovitz and the United States Marshals Service permitted him to do so by allowing him to provide confidential

information concerning the marina to Almeida and Almeida's investment partners to enable them to make the best bid for the marina. His own admission of wrongdoing is there, whether or not his testimony of it being approved by the Marshals Service and the Judge is true. The Court finds that Mr. Bell and Mr. Balogh are not credible witnesses.

The Court considers incredible and unworthy of belief portions of Bell's claim involving commissions or fees for purchasing gold, for disauthenticating a Van Gogh painting, for researching a cigarette manufacturing plant, and for the sale of a sports car and of a motorcycle. The documentation in support of these claims was inadequate and incomplete.

■ Bell and Balogh repeatedly sought to avoid having to prove much of the claims against the corporations by repeating their mantra that Almeida was ultimately responsible for everything because the corporations were his alter egos. The Court rejects this because the proof at trial fell far short of the evidence required to reach such a conclusion. *Dania Jai–Alai Palace, Inc. v. Sykes,* 450 So.2d 1114 (Fla.1984). The evidence revealed Fort Apache Marina, Inc., Fort Apache Performance Brokerage, Inc. and Apache Trading Group, Inc. and Thunderbolt Row, Inc., d/b/a Hooligan's Restaurant were all operated as separate corporations performing separate functions. Each corporation had its own books of account, bank accounts, tax reporting, and employees. Simply because there were transfers of money between the marina and Fort Apache Performance Brokerage, Inc., would not itself prove that Fort Apache Performance Brokerage, Inc. was the alter ego of Almeida. The evidence supports the view the corporations were independent entities and were not set up or operated for the purpose of defrauding creditors.

Balogh's testimony was equally flawed. Balogh admitted building an addition at Fort Apache without obtaining a building permit because it was expedient. Even though Balogh claims to hold a Florida General Contractors license, he testified that the fine "was small potatoes compared to the need"

for the space. He could not satisfactorily explain the reasons for differences in the amounts he claimed from the alleged debtors, the reasons why Almeida was liable for money advanced to the marina, and why Balogh's admitted misconduct would not act as a bar to the enforcement of any claim he might have.

The Court has not overlooked the financial problems faced by both Almeida and the corporate debtors at the time of the involuntary petitions. The corporations were out of business by March, 1995, but that is not the test for granting an Order For Relief. The specific requirements of § 303(b) must be proven.

■ The petitioners made much at trial of the Fort Apache Performance Brokerage, Inc. checks returned by its bank for insufficient funds and of Almeida's credit cards revoked by American Express Co. They ignore the lack of proof that the bank was owed any money at the time of the filing of the involuntary petitions and, as to Almeida, that American Express, the credit card issuer, was willing to receive monthly payments which apparently were being accepted even after the filing of these proceedings.

The Court has also carefully considered the evidence concerning Bell's claim to a commission on the sale of two Russian–built heavy lift helicopters. It is by far the most significant part of his claim, but it is at least the subject of a bona fide dispute for several reasons. First, the Court finds more credible Almeida's testimony that no sums were due Bell until Almeida was paid by the purchasers. This makes more sense since Almeida was not entitled to his money until the deal was complete, and it is difficult to understand why Almeida would or could pay large sums as commissions to Bell before he, Almeida, was entitled to and did receive his money. Bell knew Almeida would not have such sums until he got paid. The evidence is undisputed that Almeida has not been paid his commission. In fact, Almeida filed suit in state court to recover the monies owed to him. Second, there are several open questions whether Bell ever fully performed his obligations involving the helicopters, includ-

ing missing spare parts. Almeida testified that he personally fulfilled the deficiencies in the transaction at his own expense in order to be able to sue for the commission. This testimony creates at least a bona fide dispute if it does not entirely dispose of the issue. The Court concludes there are genuine issues as to the validity of the Bell and Balogh claims which preclude both claims from being considered as creditors entitled to be counted in these cases.

■ The claim asserted by Joseph Handy against Fort Apache Performance Brokerage is the subject of a bona fide dispute for several reasons. Mr. Handy's claim is for approximately $8,000. This figure is based in part on a check he received from Apache Performance Brokerage in the amount of $1,350 which he claims was returned as NSF (there were insufficient funds in the account to cover the check). The check clearly indicates on its face that it was returned for insufficient funds. On the reverse of the check, there is a stamp that indicates that Barnett Bank returned the check on February 11, 1994. The check also indicates on its face that the drawee bank, TerraBank, paid the check on February 14, 1994, and there is a corresponding bank stamp on the reverse of the check. It is clear, based on this exhibit and the testimony at trial, that the check, though initially returned, was honored only 3 days later. Despite this, Mr. Handy alleges that he is due the amount of the check plus treble damages pursuant to Florida Statute § 68.065.

Even if Florida Statute § 68.065 applied to Mr. Handy's joinder in this involuntary proceeding, which the Court doubts, Mr. Handy failed to satisfy the procedural requirements of the statute. In order for Mr. Handy to be entitled to treble damages, Apache Performance must have failed to make the check good within 30 days of receipt of Mr. Handy's written demand delivered to Fort Apache Performance by certified or registered mail. However, the check was made good within 3 days of its being dishonored and no evidence was offered to prove that written demand to make the check good was ever made by Mr. Handy or that it was delivered to Fort Apache Performance or Mr. Almeida.

Based on the foregoing, Mr. Handy is not entitled to the original $1,350 amount or the treble damages he is claiming. The foregoing also draws Mr. Handy's credibility into question. There may be a debt owed by Fort Apache Performance Brokerage to Mr. Handy, but the Court has doubts about what, if anything, is owed Mr. Handy.

■ The claim of McIntyre is equally unacceptable. The proofs at trial showed all the helicopter and boat engine and rigging work was done by his company, Marine Turbine Technologies, Inc., and not by McIntyre individually. Therefore, he has no claim in these proceedings. Andrus, the Trustee of Marine Turbine Technologies, Inc., filed her Joinder Of Chapter 7 Trustee Of Marine Turbine Technologies, Inc. In Involuntary Bankruptcy Petition on August 15, 1996. The Court overrules objections as to the timeliness of the joinder since the Code does not impose any pretrial bar date deadline, but nonetheless finds the claim is the subject of bona fide disputes both as to the quality and the completeness of the work done on the Bell Ranger helicopter and the Cigarette boats.

For petitioners, a witness named Armando Coll testified about the restaurant operation. He stated he was owed $9,000, and had not been paid. He also said he loaned $25,000 to Almeida which was not repaid. He was impeached by a check to him for $25,000 (Apache Exhibit A). He testified that he was not paid when he left the restaurant. This testimony was impeached by three counter checks dated June 30, July 21, and July 26, whereby Mr. Coll signed for and took $3,850 (Apache Exhibit B) and he was unable to explain (Apache Exhibit C) a $4,000 check received and deposited by him from Apache. The credibility of Mr. Coll was totally destroyed on cross examination.

On the issue of ability to pay debts when they become due, the Court notes the ability of Mr. Almeida to post or buy bonds in the nuclear submarine case in total amounts of $3,400,000. This is hardly an accomplishment within the means of one who is unable to pay debts as they become due.

878

## CONCLUSIONS

(a) The Court has jurisdiction over the parties and the subject matter.

(b) The petitioners have failed to prove the existence of at least three entities holding claims against each of the three involuntary debtors which are not contingent as to liability or are not the subject of a bona fide dispute.

(c) The claim of James Bell arising out of the sale of helicopters, if it exists, is contingent upon payment of the balance of the sales price by the purchasers and disposition of a bona fide dispute and his other claims are not believable and, therefore, he may not be counted as a petitioning creditor.

(d) The claim of Arthur Balogh is subject to bona fide disputes and may not be counted as a petitioning creditor.

(e) The claim of Ronald Meixner is only the obligation of Juan Almeida, and the Court finds Meixner is a fully secured or oversecured creditor.

(f) The claim of Ted McIntyre is rejected. The Court finds he is not a creditor of any of the involuntary debtors in these cases.

(g) The claim asserted by Elizabeth G. Andrus, Trustee of Marine Turbine Technologies, Inc., is the subject of bona fide disputes and may not be counted as a petitioning creditor.

(h) The claim of Joseph Handy is the subject of bona fide disputes and may not be counted as a petitioning creditor.

(i) The petitioners failed to prove that the alleged debtors were generally not paying their debts as the debts became due.

(j) The alleged debtors carried their burden of proving certain debts were the subject of a bona fide dispute.

(k) These involuntary petitions have not been proven and they are dismissed, with prejudice.

(l) The Court retains jurisdiction to award costs and attorneys' fees as provided by § 303(i).