**In re BIOGENETIC TECHNOLOGIES, INC., Debtor.**

**No. 99–9599–8G7.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Dec. 29, 1999.

Daniel J. Herman, Largo, FL, for Debtor.

Michael C. Markham, Clearwater, FL, for Petitioning Creditors.

## ORDER ON MOTION TO DISMISS

PAUL M. GLENN, Bankruptcy Judge.

**THIS CASE** came before the Court for hearing to consider the Motion to Dismiss filed by the alleged Debtor, Biogenetic Technologies, Inc.

Biologics, Inc. (Biologics) filed an involuntary chapter 7 petition against Biogenetic Technologies, Inc. (Biogenetic), and Biogenetic subsequently filed a Motion to Dismiss the involuntary petition. In the

Motion to Dismiss, Biogenetic asserts that Biologics' claim against it is "contingent as to liability, and subject to a bona fide dispute." Consequently, Biogenetic contends that Biologics is not an entity that may commence an involuntary bankruptcy case against Biogenetic pursuant to § 303(b) of the Bankruptcy Code.

The Court entered an Order on Preliminary Hearing on Motion to Dismiss Involuntary Petition. The Order provided that the Court would take "under advisement the issue of whether or not the claims of Biologics, Inc. against the involuntary Debtor are subject of bona fide dispute within the meaning of § 303(b), which determination may be dispositive of the contested matter." The Order further provided that the parties were permitted to file "documents and pleadings from the state court action pending between involuntary petitioner and involuntary Debtor, along with affidavits, transcripts, and other pertinent documents."

In accordance with the Order, Biogenetic filed (1) an Affidavit of Gene Zamba, the prior president of Biogenetic, and (2) a Statement of State Trial Counsel of Debtor Biogenetic Technologies, Inc. Copies of the docket sheet relating to the state court action, various pleadings filed in the action, and other documents are attached to the Statement of State Trial Counsel.

Biologics filed a Memorandum in Opposition to Motion to Dismiss Involuntary Petition. Copies of deposition transcripts, correspondence, and other documents are attached to the Memorandum.

## Background

Biologics engaged in the business of manufacturing hospital beds. On January 21, 1998, Biogenetic and Biologics entered an agreement entitled Exclusive Marketing and Distribution Agreement (the Agreement). The Agreement provided that Biogenetic and Biologic "shall incorporate a new corporation to be named Bio–Marketing, Inc. . . ." (Agreement ¶ 2). Although the Agreement provided that Biog-

enetic and Biologics were to incorporate the new corporation, the Agreement provided that "[t]he ownership of all the issued and outstanding stock of BIM shall be fifty-one (51%) percent ownership to [Biogenetic] and 49 (49%) percent to Mark Hagopian, individually." (Agreement ¶ 7). Biogenetic agreed to contribute $510 to the initial capital of the new corporation, and the Agreement indicated that $490 would be contributed by Mark Hagopian. Biogenetic signed the Agreement by its president, Gene Zamba, and Biologics signed the Agreement by its president, Mark Hagopian. Hagopian did not sign the Agreement individually. The Agreement provided that the new corporation "shall be the sole and exclusive marketing and distributor for all products of [Biologic]." (Agreement ¶ 2). The Agreement also provided that the new corporation: "shall have the sole and exclusive rights to the states of Georgia, Florida, and Alabama subject to certain conditions." (Agreement ¶ 3); "shall have the right of first refusal to all other states, Canada, Central America and South America." (Agreement ¶ 3); and "shall have the option to sell any and all products of [Biologics] in any other states, Canada or Central and*or South America." (Agreement ¶ 4). The territorial rights are apparently rights to sell the products. The Agreement also provided that the new corporation was to purchase 500 beds from Biologics upon execution of the Agreement. The purchase price for the beds, a total of $2.9 million, was to be paid in installments, and the payment terms of at least some of the installments were specified.

Biologics filed a Complaint against Biogenetic in the state court in Pinellas County, Florida, on April 27, 1998. The Complaint commenced an action captioned Biologics, Inc. vs. Biogenetic Technologies, Inc., Millennium, Inc., and Bio–Marketing, Inc., Case No. 98–002748–CI–021. Biologics subsequently filed a Second Amended Complaint for Injunctive Relief and Damages. The Second Amended Complaint contains three counts. Count

I is an action for an injunction, Count II is an action for damages for breach of contract, and Count III is an action for damages for fraud in the inducement. Generally, Biologics alleged that Biogenetic defaulted with respect to its obligations under the Agreement, that a forbearance agreement was entered, that Biogenetic and others defaulted further, and that the forbearance was withdrawn.

Biogenetic and other defendants filed an Answer, Affirmative Defenses, and Counterclaim to the Second Amended Complaint. Biogenetic denied the material allegations of the Complaint and asserted six affirmative defenses. As affirmative defenses, Biogenetic asserted that (1) the Complaint fails to state a cause of action for an injunction; (2) Biologics is estopped from bringing an action for breach of contract; (3) Biologics waived its right to bring an action for beach of contract; (4) Biologics repudiated the Agreement and thereby made performance impossible; (5) Biologics is barred from enforcing the agreement by virtue of a novation or new agreement between the parties; and (6) Biologics is estopped from seeking equitable relief because Biologics itself defaulted under the agreement by failing to deliver the beds in accordance with the contract and by making fraudulent misrepresentations. Finally, Biogenetic asserted a Counterclaim against Biologics which contained a claim based on fraud in the inducement, and Biogenetic and Bio–Marketing, Inc. asserted a counterclaim for breach of contract.

Biologics filed a written Answer to the Counterclaim.

Biogenetic also filed an action against Mark Hagopian in the state court in Pinellas County, Florida. This action is a one count complaint for fraud in the inducement. Hagopian filed an answer and an affirmative defense. This action has been consolidated with the action by Biologics against Biogenetic and others, described above.

The docket attached to the Statement of State Trial Counsel of Debtor Biogenetic Technologies, Inc. reflects that the case has been actively litigated. Substantial discovery has been undertaken, including various requests for the production of documents and the submission of interrogatories. Additionally, at least six depositions have been taken in the case.

On April 8, 1999, Biologics filed a Motion to Set Case for Trial. In the motion, Biologics asserted that the case was at issue, that the Defendants had demanded a jury trial, and that Biologics estimated that three days would be required to conduct the trial.

On June 10, 1999, Biologics filed the involuntary Chapter 7 petition against Biogenetic.

On August 10, 1999, the state court issued an Order Setting Jury Trial and Pre–Trial Conference, which scheduled a Pre–Trial Conference for January 20, 2000, and the jury trial for February 7, 2000.

No judgment has been entered in the state court litigation.

### Discussion

Section 303(b) of the Bankruptcy Code provides:

**11 USC § 303. Involuntary cases**

\* \* \*

▉ (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either *a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute,* or an indenture trustee representing such a holder, if such claims aggregate at least $10,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee

of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of *such holders that hold in the aggregate at least $10,-775 of such claims.*

(Emphasis supplied). The section controls who may file an involuntary bankruptcy case against a debtor. Section 303(b) restricts a party's right to file an involuntary petition because an involuntary bankruptcy case is a severe remedy, and Congress prefers that creditors settle their disputes without resorting to the involuntary bankruptcy procedure. *In re Atwood,* 124 B.R. 402, 405 (S.D.Ga.1991). To satisfy the requirements of § 303(b), a petitioning creditor must hold a claim that is "not contingent as to liability or the subject of a bona fide dispute."

■ Establishing the existence or absence of a bona fide dispute involves a shifting burden of proof. A "petitioning creditor must establish a prima facie case that no bona fide dispute exists. Once this is done, the burden shifts to the debtor to present evidence demonstrating that a bona fide dispute does exist." *In re Rimell,* 946 F.2d 1363, 1365 (8th Cir.1991). See also *In re Manhattan Industries, Inc.,* 224 B.R. 195, 200 (Bankr.M.D.Fla. 1997)("Once a creditor has established that its claim is not subject to a bona fide dispute, 'the burden shifts to the Debtor to present evidence of a bona fide dispute.' "); *In re Apache Trading Group, Inc.,* 210 B.R. 869, 871 (Bankr.S.D.Fla.1997); *In re Audio Visual Workshop, Inc.,* 211 B.R. 154, 158 (Bankr.S.D.N.Y.1997); and *In re Gutfran,* 210 B.R. 672, 673 (Bankr.D.Conn. 1997).

"The Bankruptcy Code does not define the term 'bona fide dispute.' " *In re Audio Visual Workshop, Inc.,* 211 B.R. at 157. "The Code does not define a 'bona fide dispute' and thereby leaves the term's meaning to judicial determination." *In re Rimell,* 946 F.2d at 1365.

■ Legislative history may provide some guidance in formulating a workable standard for determining whether a claim is subject to a bona fide dispute for purposes of § 303(b).

The legislative history makes it clear that Congress intended to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal. Congress plainly did not intend to require a debtor to pay a legitimately disputed debt simply to avoid the stigma of bankruptcy.

*In re Atwood,* 124 B.R. at 407.

■ It appears generally accepted that an objective standard should be applied in determining whether a claim is the subject of a bona fide dispute. The "proper standard requires the bankruptcy court to 'determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt.' " *In re Rimell,* 946 F.2d at 1365 (quoting *In re Busick,* 831 F.2d 745, 750 (7th Cir.1987)); *In re Manhattan Industries, Inc.,* 224 B.R. at 199; *In re Willow Lake Partners II, L.P.,* 156 B.R. 638, 642 (Bankr.W.D.Mo. 1993). If there is "a genuine issue of material fact that bears upon the debtor's liability to the petitioning creditor, or a meritorious contention as to the application of law to undisputed facts, the claim is subject to a bona fide dispute." *In re Audio Visual Workshop, Inc.,* 211 B.R. at 157. "Because the standard is objective, neither the debtor's subjective intent nor his subjective belief is sufficient to meet this burden." *In re Rimell,* 946 F.2d at 1365.

■ It further appears that the Court's function for purposes of § 303(b) is not to adjudicate the claim, but only to determine whether a bona fide dispute actually exists. Consequently, the Court's role in determining whether such a dispute exists involves a limited analysis and not a decision as to the outcome of the dispute.

The court's objective is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve

the dispute. *Id.* This does not mean that the bankruptcy court is totally prohibited from addressing the legal merits of the alleged dispute; indeed, the bankruptcy court may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists. *In re Rimell,* 946 F.2d at 1365. "The outcome of a dispute need not be resolved, only its presence or absence and the Court need engage only in a limited analysis of the claims at issue." *In re Manhattan Industries, Inc.,* 224 B.R. at 199. See also *In re Atwood,* 124 B.R. at 407–08 ("A court need not resolve any of these disputes, but only determine that they are genuine.")

 Whether a bona fide dispute exists in a particular case may be readily apparent in certain circumstances. Generally, for example, an unappealed, unstayed judgment is not subject to a bona dispute. *In re Manhattan Industries,* 224 B.R. at 200. Further, if a claimant establishes that its claim is well-grounded and that no defenses have been asserted to it, the claim may not be subject to a bona fide dispute. *In re Audio Visual Workshop,* 211 B.R. at 158. In other cases, however, although the concept may appear simple, "in practice it is difficult to determine whether a claim is contingent or subject to a bona fide dispute." *In re Atwood,* 124 B.R. at 406.

 Finally, an alleged debtor's assertion of a counterclaim against the petitioning creditor, even if the counterclaim is substantive, does not create a bona fide dispute under § 303(b). *In re Manhattan Industries,* 224 B.R. at 200. Although counterclaims may reduce the amount of the claim, they do not dispute the merits of the claim itself. *Id.* See also *In re Audio Visual Workshop,* 211 B.R. at 158.

### Application

 Biologics contends in its Memorandum in Opposition to Motion to Dismiss Involuntary Petition that its claim against Biogenetic is for breach of the Exclusive Marketing and Distribution Agreement. In the Memorandum, Biologics asserts that "[a]lthough there are several breaches of the Agreement by BGTI, the most obvious breach is the failure to make the initial installment payment of $773,000.00 on March 1, 1998." The Second Amended Complaint filed in the state court action does not specifically refer to the nonpayment of the installment due on March 1, 1998. In the Complaint, Biologics alleges only that "[s]ometime prior to March 24, 1998, BGTI and Millennium defaulted with respect to the obligations under the Agreement."

The Court determines that Biologics' claim is the subject of a bona fide dispute.

The dispute appears to center on three primary contentions.

First, Biogenetic contends that the Exclusive Marketing and Distribution Agreement was never enforceable because Biologics made two material misrepresentations prior to execution of the Agreement, and because Biogenetic relied on the misrepresentations when it entered the Agreement. According to Biogenetic, Biologics represented that (1) its cost to manufacture the beds was $5,800 per bed, and that (2) the assets or revenues of an entity known as Air Fluid Systems, Inc. were $1,500,000. The Agreement provided that the new corporation would acquire the assets of Air Fluid Systems after it had completed the purchase of 250 beds. Biogenetic contends that the two representations were false and that Biologics knew that they were false when the representations were made.

To support its contention that the two representations form the basis of a bona fide dispute, Biogenetic submitted, *inter alia,* (1) the Affidavit of Gene Zamba (¶¶ 5, 6, and 7); and (2) the Statement of State Trial Counsel of Debtor Biogenetic Technologies, Inc. (¶¶ 21, 23). Copies of pleadings filed in the state court action and excerpts of certain depositions are at-

tached to the Statement of State Trial Counsel.

Second, Biogenetic contends that the Exclusive Marketing and Distribution Agreement is not enforceable because the Agreement was altered by Biologics after it was signed by Gene Zamba on behalf of Biogenetic. Specifically, in paragraph 6 of the Agreement, following the provision which required Biogenetic to purchase 500 beds, Biologics added the handwritten phrase "which will be delivered and paid for within 180 days." Biogenetic asserts that it never agreed to this modification.

To support its contention that the unauthorized revision forms the basis of a bona fide dispute, Biogenetic relies on (1) the Affidavit of Gene Zamba (¶ 8); and (2) the Statement of State Trial Counsel (¶¶ 3, 18), together with the pleadings filed in the state court action and deposition testimony. In his deposition, Mark Hagopian, the president of Biologics, acknowledged that he made the revision, and that the revision was initialed by himself and Dan Wey, a representative of Millennium Investment, Inc. He was not sure whether Gene Zamba was present when the revision was discussed. In his Affidavit, Mr. Zamba states that the change was made "without my permission or approval." (Affidavit, ¶ 8).

Third, Biogenetic contends that the Exclusive Marketing and Distribution Agreement was modified or superseded by a subsequent oral agreement for Biogenetic to acquire the manufacturing rights for all of Biologics' product. The purchase price for the rights was $8,500,000. Biogenetic further asserts that it made an initial payment pursuant to this oral agreement in the amount of $160,000. According to Gene Zamba, the parties entered the oral agreement on April 7, 1998, and paid $160,000 pursuant to the agreement to acquire necessary parts and equipment for production of the beds. (Affidavit of Gene Zamba, ¶ 10).

Although Biologics disputes the existence of a superseding oral agreement for the purchase by Biogenetic of Biologics' manufacturing rights, it appears that negotiations continued between the parties after the entry of the Exclusive Marketing and Distribution Agreement. Between March 24, 1998, and April 13, 1998, for example, an attorney for Biologics wrote a series of letters to an attorney at Millennium Investment, Inc. Trust. Apparently, Millennium is a shareholder and financing entity for Biogenetic. The letters purport to document Biologics' initial agreement to forbear from instituting any action against Biogenetic under the Marketing Agreement, its withdrawal of the forbearance agreement, and its subsequent offer to reinstate the forbearance agreement. The letters also refer to meetings to discuss a "mutual modification" of the Marketing Agreement, the drafting of the "substance of the agreement" to be signed by Biologics, and the need for such a draft "if we are to go forward with any type of transaction." On March 16, 1998, Mark Hagopian, as president of Biologics, wrote a letter to Gene Zamba at Biogenetic regarding past due amounts under the Exclusive Marketing and Distribution Agreement, and further stated that "[w]e are now discussing a possible acquisition of the 900T product line." At some point, an undated document entitled "Proposed Purchase Agreement" was prepared on Biogenetic's stationery. The "Proposed Purchase Agreement" contemplated the purchase of "the 900T product line" for the purchase price of $8.5 million. Additionally, on April 13, 1998, a summary of invoices was sent to Millennium for payment. The invoices were for materials received by Biologics.

As set forth above, the Court's role is only to determine whether a dispute exists, and not to resolve the dispute. Applying this limited analysis, the Court determines that there is an objective basis for either a factual or a legal dispute as to the validity of Biologics' claim against Biogenetic.

It appears that a written Agreement was signed on behalf of Biogenetic and Biologics on January 21, 1998.

Biogenetic asserts that the written Agreement was not enforceable because of misrepresentations that were made by Biologics prior to the execution of the contract, and also because of a clause that was added after execution of the Agreement, but without authorization from Biogenetic. The Court has reviewed the documents filed by Biogenetic to support these claims. The Court does not purport to prejudge the merits of the claims, but finds that a bona fide dispute exists.

The Court also finds that a bona fide dispute exists with respect to whether the parties continued to operate under the Agreement after March 1, 1998, or whether they were looking to a loosely-formed new agreement for the acquisition of Biologics' manufacturing rights as the operative contract. It is clear that the parties continued to negotiate after the alleged default on March 1, 1998, and it appears that the agreement subject to the negotiations would have replaced or obviated the prior written Agreement. The papers, including the deposition testimony, reflect a conflict regarding the parties' understanding of the status of the "new" agreement. The Court cannot determine from the record whether a new oral agreement was entered on April 7, 1998, as contended by Biogenetic, or whether the written Agreement remained in effect, and the subsequent negotiations represented only a failed effort to reach a larger accommodation.

### Conclusion

For the reasons set forth above, the Court finds that Biologics' claim against Biogenetic is subject to a bona fide dispute within the meaning of § 303(b) of the Bankruptcy Code. Consequently, Biologics is not an entity that may file an involuntary petition pursuant to that section, and Biogenetic's Motion to Dismiss should be granted.

Accordingly:

**IT IS ORDERED** that:

1. The Motion to Dismiss filed by Biogenetic Technologies, Inc. is granted.

2. The above-captioned chapter 7 case is dismissed.