### In re SOUTHEAST COMMUNITY MEDIA, INC., Debtor.

### Gus A. WOOD, III, Trustee, Plaintiff,

v.

### Roberta DAVIS, Defendant.

**Bankruptcy No. 1–81–01204.**
**Adv. No. 1–81–0612.**

United States Bankruptcy Court,
E.D. Tennessee.

Feb. 24, 1983.

Gus A. Wood, III, Chattanooga, Tenn., for the trustee.

Richard Korsakov, Chattanooga, Tenn., for defendant.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

Southeast Community Media, Incorporated, owned and operated radio station WEDG in Soddy, Tennessee. Before its bankruptcy, the debtor sold the radio sta-

tion to the defendant, Roberta Davis. In his complaint, the trustee alleged that the sale to Mrs. Davis was an avoidable preferential transfer to the extent the consideration was Mrs. Davis's cancellation of debts. The trustee also alleged that the transfer was fraudulent because made for an inadequate consideration or with intent to hinder, delay, or defraud the corporation's creditors.

When Mrs. Davis first became interested in radio station WEDG, George C. Hudson, III, known as Cliff Hudson, was the principal officer and stockholder in the corporation. In transactions between the corporation and Mrs. Davis, Cliff Hudson acted for the corporation. Also involved in the transactions were Mrs. Davis's son, Robert Davis, who is an attorney, and Mrs. Davis's husband, Roy Davis.

The testimony at the trial and the accompanying documentary evidence give at best a cloudy and confusing picture of the dealings between Mrs. Davis and Cliff Hudson as to WEDG radio.

Roy and Roberta Davis knew Cliff Hudson before Mrs. Davis became interested in WEDG radio. Hudson had worked at WSIM radio, a station once owned by the Davises (or by Mrs. Davis). In December, 1978, Hudson and Mrs. Davis agreed that she would acquire an interest in the station by buying 50 percent of the stock of the debtor corporation, which owned the radio station. The purchase price was to be $75,-000. The parties at various times said the price was $1,500.00 per share. The evidence also indicated that there were 1,000 shares. Obviously the price could not have been $1,500 per share if Mrs. Davis was to acquire 500 shares for $75,000. The defendant's suggested findings of fact clear up the confusion by pointing out that the price was $1,500 for each one percent of the stock (ten shares).

Mrs. Davis was to pay the purchase price partly in cash and the remainder by assuming part of the debts owed to American National Bank and Lee J. Cooper. The debt to American National Bank arose out of loans made for the operation of the radio station. The debt to Lee J. Cooper arose from Cliff Hudson's purchase of the radio station from him. Hudson bought the station from Cooper in 1975 for a purchase price of $150,000. The debt to Cooper was secured by a mortgage on the radio station's property. Mrs. Davis did not assume any of the debt to American National Bank because she did not like the terms offered by the bank. Cliff Hudson testified that after this happened, Mrs. Davis agreed to pay the debt to Lee Cooper.

Mrs. Davis paid about $16,100 in cash and furnished Hudson a car valued at $2,200. About this time Roy Davis wrote a check to Cliff Hudson for $2,000.

After the purchase agreement, Mrs. Davis and Hudson agreed that whenever the station did not make enough money to pay operating expenses and debts they would make up the difference by equal contributions. They kept a handwritten record of such contributions for the year 1979. It showed that Mrs. Davis and Hudson each paid about $18,400. The trustee offered into evidence checks written by Roy or Roberta Davis to or for the benefit of WEDG or Southeast Community Media. (Exhs. 10, 11 & 12). The checks written in 1979 and January, 1980, total about $14,000. Mrs. Davis also presented three checks to Pioneer Bank which, she testified, were to repay loans of money put into the station. The checks totaled about $18,000.

Cliff Hudson testified that by February, 1980, Mrs. Davis had acquired 60 percent of the stock of Southeast Community Media. In 1979 Mrs. Davis wrote two checks to Cliff Hudson for $6,000 each, one identified on its face as payment for 5 percent of the stock and the other identified on its face as payment for 4 percent of the stock. At $1,500 for one percent of the stock, $3,000 more was necessary to pay for 10 percent of the stock. Neither party explained when or whether the additional $3,000 was paid.

Mrs. Davis's son, Robert, represented her in the stock purchases. According to Hudson, Robert Davis had control of the corporation's minute book after the original purchase agreement was executed and did is-

sue some stock certificates. Mrs. Davis said that she never received any stock certificates.

After Mrs. Davis's original agreement to buy 50 percent of the stock, she was vice-president of the corporation. Cliff Hudson was president, and Bob Davis was secretary-treasurer. Mrs. Davis never formally resigned from her position as vice-president.

In December, 1979 or January, 1980, Mrs. Davis discovered that Cliff Hudson had collected some accounts receivable and used the money for personal expenses, rather than depositing it to the radio station's account. Mrs. Davis decided that she no longer wanted to be in business with Hudson. She testified that she told him she would buy him out or he could buy her out. Hudson didn't remember Mrs. Davis offering to buy his share of the corporation.

An agreement was reached for Hudson to buy Mrs. Davis's stock for $56,000. Hudson testified that he had no choice but to agree since Robert Davis and Roy Davis threatened him with criminal prosecution if he did not agree. Hudson testified that he signed a document admitting guilt and delivered it to Robert Davis. The contract of sale provided in Paragraph 6:

> Buyer and seller specifically agree and acknowledge that this agreement in all matters pertaining to this sale are subject to Tennessee Law and that this agreement is being executed in Chattanooga, Hamilton County, Tennessee, and agree that these terms are to be met in lieu of criminal prosecution of the buyer by the sellers.

Mrs. Davis testified that she did not threaten to prosecute Hudson and would not have done so because he had a family to support.

The $56,000 price was supposed to repay Mrs. Davis the money she had put into the station from the time of her stock purchase in December, 1978, until the time of the resale to Hudson on February 1, 1980. Mrs. Davis's attorney conceded that they could not substantiate this figure, at least in the sense that they did not have a detailed accounting of Mrs. Davis's investment in the station.

Along with the sale contract, Cliff Hudson and others executed a suretyship agreement guaranteeing payment of the debts to the Davises. The agreement and the sale contract each provided that Roberta Davis would retain ownership of her stock until paid in full.

Hudson was to pay $10,000 in cash. To raise this money he sold radio station equipment that was subject to Lee Cooper's mortgage. Hudson executed a $46,000 promissory note for the balance.

After February, 1980, Mrs. Davis did not take an active part in the management or operation of the radio station until late 1980 or early 1981.

After several months, Hudson defaulted on payments due under the $46,000 note.

During the summer of 1980, Cliff Hudson decided that he should sell the radio station. In June, 1980, Hudson contracted with a broker, C. Alfred Dick, to sell the station. He obtained an offer to purchase for $300,000 but the sale did not take place because some of the proposed investors backed out. The proposed sale was negotiated with a Mr. Lewis Kincaid.

After the sale fell through, Hudson attempted to negotiate a sale to Kincaid. Apparently several draft agreements were drawn up but never executed. One provided for a purchase price of $190,000 to be paid over twelve years with no interest, and payments on Lee Cooper's mortgage debt to be credited against the purchase price. The principal balance of the Cooper mortgage was then about $67,000. Mr. Kincaid apparently paid Hudson the $2,000 earnest money called for by the contract. Mrs. Davis would not agree to the sale on these terms and threatened to bring suit on the $46,000 note if Hudson attempted to go through with the sale. Hudson testified that $190,000 was the lowest offer made for purchase of the radio station.

Another draft provided for Kincaid to buy the station for a purchase price of $230,000 which did not include the mortgage debt owed to Lee Cooper.

On December 15, 1980, there was a fire at the radio station. It rendered some of the equipment unuseable and damaged the building. It is not clear whether the agreement to sell the station for $190,000 was drafted before or after the fire. It was dated January, 1981, but could have been drafted before.

About the time of the fire, Mrs. Davis decided that the only way she could possibly recover the money she had put into the station was to buy it and operate it. Several agreements were executed as part of Mrs. Davis's acquisition of the station.

On December 22, 1980, Cliff Hudson, on behalf of Southeast Community Media, assigned the proceeds due for the fire loss to Roy Davis. The assignment provided that it was made "for the express purpose of obtaining repairs and funds for the replacement of business equipment which are necessitated as a direct result of a fire loss ... for which insurance proceeds are due ...." Attached to the assignment was a list of equipment that the radio station was supposed to have.

On January 15, 1981, Hudson, on behalf of Southeast Community Media, executed a written agreement to sell all of its assets used in the operation of WEDG radio to Roberta Davis.

One of the "whereas" clauses at the beginning of the agreement stated that the seller and buyer would not be able to consummate the sale until the FCC (Federal Communications Commission) assigned the broadcast license to Mrs. Davis.

Other provisions of the contract were as follows:

(1) *Purchase and Sale of Assets.* Subject to the conditions and terms set forth herein, upon the closing date, Seller will sell, assign, transfer, convey, and set over unto Buyer, full and absolute title ... to the assets set forth in Exhibit "A" attached hereto ....

(2) *Assignment of Licenses, Leases, and Contract Rights.* Subject to the terms and conditions set forth herein, on the closing date, Seller will assign to Buyer the following [licenses, leases, and contracts]. Buyer shall not assume any liabilities ... with respect to or arising out of performance under said Licenses, Leases, or Contracts prior to the closing date ....

The contract also provided that "[u]pon the closing date, Buyer will be vested with absolutely all Seller's title to and interest in the assets ... as itemized in Exhibit "A" ...."

The contract (paragraph 7) provided for a closing date to be set within a limited time after FCC approval of the transfer of the FCC radio license. In the event the FCC refused to grant Mrs. Davis a license, the contract obligated the seller to return to Mrs. Davis any earnest money she paid under the contract.

The contract provided that the seller would "maintain control and ownership of the Radio Station until the closing date." Other provisions essentially followed this provision as to accounts receivable, risk of loss, insurance, and operation of the station until the closing date.

On the same day that the sale contract was executed, Hudson for himself and Southeast Community Media executed a promissory note for $32,300 payable to Roberta Davis on demand, with interest at an annual rate of 13%. The interest was payable monthly. The note provided that it was for sums advanced on behalf of WEDG radio and Southeast Community Media after February 1, 1980.

Hudson testified that the note was for advances which weren't actually made. He testified that Robert Davis told him the note was simply to protect the assigned insurance proceeds from creditors' claims and would be an amount necessary to keep the station going pending FCC approval of the license transfer.

Hudson was asked if he recalled a meeting in which a list of expenditures and advances was discussed, certain items deleted, and the amount of the note agreed upon. Hudson did not remember any such meeting.

Mrs. Davis agreed to pay $150,000 for the assets of the corporation. Part of the purchase price was to be paid by cancellation of the $46,000 and $32,300 notes. The balance of the purchase price ($71,700) was to be paid mostly by payment or assumption of the mortgage debt to Lee Cooper and by paying other debts. Any remainder of the price was to be paid to the seller.

After the assignment of the insurance proceeds, Roy Davis, Robert Davis, and Cliff Hudson undertook repairs at the station and replacement of the damaged equipment. Roberta Davis also tried to reconstruct the station's accounts receivable and payable records. She quit working at the station after the sale agreement was executed in January, 1981.

Cliff Hudson testified that not all the equipment that was to be replaced was replaced. Roberta Davis testified that some equipment was purchased but was not at the station. She also testified that some of the equipment was purchased with funds that were not insurance proceeds. The insurance proceeds were deposited in the Davises' checking account.

After the fire, the Davises also hired people to help operate the station (a salesman and an announcer or two). Though the station was operable within three days after the fire, it operated only sporadically until the Davises hired this extra help. The Davises also made some delinquent payments on the Cooper mortgage debt and paid some other debts. Though Roberta Davis withdrew from work at the station after the sale agreement was executed, she continued to put money in the station, and Roy Davis apparently continued to help in the operation.

Hudson testified that after the third week in January, 1981, he withdrew from operation of the station. He also testified that he did not remember the Davises making any payments on his behalf.

In May, 1981, the FCC approved the transfer of the license to Mrs. Davis. A sale "closing" was held on June 9, 1981. The mortgage debt to Lee Cooper was $65,-244.14 at the time of the closing.

An involuntary petition in bankruptcy was filed against Southeast Community Media, Inc., on June 23, 1981. An order for relief was entered on July 28, 1981.

The trustee was paid the $1,073.15 of the purchase price that remained to be paid after cancellation of the promissory notes, assumption of the obligation to pay the mortgage debt to Lee Cooper, and the payment of certain creditors in cash.

Mrs. Davis testified that in 1981 the station lost $24,261.50. This amount is taken from defendant's exhibit 4, a summary of receipts and disbursements for 1981. Defendant's exhibit 3 is a summary prepared by Mrs. Davis. It shows a loss of $16,694.81 for May through December of 1981. The court's calculations from Exhibit 3 show that during that time expenses averaged about $4,800 per month while sales receipts averaged about $2,700 per month. Exhibit 3 also shows a loss during January through March, 1982 of $10,393.32. During these three months, the court's calculations show that expenses averaged about $6,400 per month while sales receipts averaged about $2,900 per month.

Mrs. Davis did not expect any great improvement in the station's financial condition because of the limited market area and the poor reputation of the station under Cliff Hudson's management.

The evidence as to the value of the station was primarily the testimony of C. Alfred Dick. He testified that he had been a broker of radio stations for seven years and had sold from five to thirteen per year for a total of about fifty. He valued the station at $350,000 in the summer of 1980 when Cliff Hudson hired him to sell it. He said the station could have been sold to a responsible party for that amount on reasonable terms. He testified that reasonable terms would be a down payment of $50,000 to $100,000, with the balance to be paid with interest over a ten year period. He testified that the fire should not have materially affected the value of the station if it continued to operate. Along this line, he said that the physical assets of a radio

station are of little importance to its value. The important thing is the "market", by which he meant the population of the broadcast area, the retail sales in the area, and the per capita income in the area. He also testified that the value of the station immediately before the bankruptcy of Southeast Community Media should have been about the same, but its salability was diminished because of the poor state of the economy in general and because of high interest rates.

Mr. Dick testified that WEDG broadcast only during the daylight hours, that its signal reached only the northern portion of Hamilton County, Tennessee and that it competed with numerous other radio stations. He admitted that a rule of thumb for valuing radio stations is to multiply the station's annual billings by 2.5. He said the rule didn't apply to a small station like WEDG. He also denied that WEDG's situation was similar to that in Alamo, Tennessee, where he recently sold a permit to build a station, with no competitors located in the county, for $10,000. He testified that the market value of the permit was about $20,-000 but an FCC rule prevented any profit on the sale.

### Discussion

The trustee seeks to recover from Mrs. Davis under two provisions of the Bankruptcy Code, §§ 547 and 548 on preferential and fraudulent transfers. Section 547(b) defines when a transfer is preferential:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Section 548 defines several kinds of fraudulent transfers, but the trustee relies on two provisions in particular:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

. . . .

The preference statute and the fraudulent transfer statute both apply only to transfers made within a certain period of time before the bankruptcy petition was filed. The transfer in question is the sale by the debtor of all the radio station's assets to the defendant. The sale took place at the earliest in January, 1981, easily within a year before the bankruptcy petition was filed in June, 1981. However, under

the preference statute the trustee need not prove that the transfer was to an "insider" if the transfer was made within 90 days before filing of the bankruptcy petition. The defendant argued that the sale occurred in January, outside the 90 days, and cannot be avoided as a preference unless the trustee proves that she was an insider.

■ For purposes of the preference statute, it defines when a transfer is made. The court need go no further than the fundamental rule that a transfer is not made any earlier then when it takes effect between the parties. 11 U.S.C. § 547(e)(2).

■ The sale contract clearly makes FCC approval of the license transfer to Mrs. Davis a condition to the completion of the sale. If the FCC had not approved, Mrs. Davis would never have become the owner of the station. The contract also made the closing date the relevant time when the rights and obligations of ownership would be transferred to Mrs. Davis. The trustee is apparently correct in arguing that the transfer occurred at the time of closing, two weeks before the bankruptcy petition was filed. Certainly the transfer did not occur before the FCC approved the license transfer, and that occurred in May, well within the 90 days before filing of the bankruptcy petition. Thus, in order to show that the transfer was preferential, the trustee was not required to prove that Mrs. Davis was an "insider".

■ Furthermore, since the transfer occurred within the 90 days, the trustee has the benefit of a presumption that the debtor was insolvent at the time of the transfer. 11 U.S.C. § 547(f).

At this point the court can eliminate one of the alleged theories of recovery under the fraudulent transfer statute. The trustee alleged that the transfer was made with actual intent to hinder, delay, or defraud the debtor's creditors. The trustee apparently hoped to prove actual intent by showing that at a time when creditors were closing in on the business and it was in distress, the debtor sold its assets for an outrageously low price to a creditor familiar with the debtor's financial condition. In essence, the argument is that the sale was made to prefer Mrs. Davis to the detriment of other creditors.

■ Mrs. Davis and Cliff Hudson testified in effect that the sale was made because Mrs. Davis was threatening to sue on the $46,000 note and she thought her only chance to recover her debt was to buy the station and operate it. The sale contract provided that the sale was to be conducted as a bulk sale with notice given to creditors as required by the bulk sales statutes. Though Mrs. Davis and Cliff Hudson were primarily concerned with Mrs. Davis's debts, they did not proceed with the sale knowing that it would frustrate other creditors but disregarding their rights. In such circumstances, the court cannot say that the sale was made with actual intent to hinder, delay, or defraud other creditors. See 4 Collier on Bankruptcy ¶ 548.02 at 548–33—548–41 (15th ed. 1982).

Other preliminary issues concern the notes for $46,000 and $32,300. The notes were allegedly given to evidence debts to Mrs. Davis for money she advanced to the radio station. The trustee attempted to show that Mrs. Davis did not advance as much as either note and that the $46,000 note was unenforceable because it arose from an illegal contract.

■ With regard to the $46,000 note, there was no need for this proof. Cliff Hudson executed the $46,000 note for the purchase of Mrs. Davis's stock in the debtor. The $46,000 debt was not owed by the debtor corporation. Furthermore, at the time of the sale, the $46,000 note was not secured by either a perfected pledge of the debtor's stock or a perfected mortgage of its assets. Thus, the cancellation of the $46,000 note gave no consideration to the debtor.

■ Since the $46,000 note was not owed by the debtor, the sale could not have been a preferential transfer as to it. 11 U.S.C. § 547(b)(2). Of course, the fact that payment of the debt was of no benefit to the debtor affects the adequacy of the consideration for purposes of deciding whether the sale was a fraudulent transfer.

The trustee indirectly argued that he should recover the $10,000 that Cliff Hudson paid in cash for the purchase of the stock. The payment was made more than a year before the bankruptcy petition was filed against the debtor and so is not recoverable under the preference or fraudulent transfer statutes. It appears doubtful that any of the debtor's creditors, except perhaps Lee Cooper, could avoid this transfer. In any event, the trustee did not assert the right of any creditor of the debtor to recover the payment. 11 U.S.C. § 544(b).

The testimony leaves unclear the purpose of the $32,300 note. Cliff Hudson testified that the note was for money to operate the station that was never actually advanced and that execution of the note was somehow connected to the assignment of the fire insurance proceeds. He may have meant that it was for money to operate the station until the insurance proceeds were paid. He may have meant that it was to offset the money lost by the station when it assigned the proceeds, but in that case the note should have been payable to the debtor rather than obligating the debtor to pay Mrs. Davis. In the absence of any convincing evidence to the contrary, the court believes the note should be taken at face value as having been given to repay Mrs. Davis for money advanced to operate the station.

Finally, the most important preliminary question is what was the value of the radio station at the time of the transfer to Mrs. Davis. The questions of whether the transfer was fraudulent or preferential cannot be answered without determining the value of the station.

The court does not mean merely the value of the equipment and other assets necessary to the operation of the radio station. The parties obviously intended a transfer of the radio station as a going business. That is why FCC approval of Mrs. Davis as the licensee was the condition on which the sale hinged. The transfer in question was made with FCC approval and was a transfer of the station as a going business.

C. Alfred Dick testified that the station should have been worth about $350,000 shortly before the bankruptcy of the debtor. He valued the station at this amount in the summer of 1980, about a year before the bankruptcy. He was unable to find a buyer for that amount. He obtained an offer to buy the station for $300,000, but the offerors did not go through with the deal. Cliff Hudson offered to sell the station to one of the proposed purchasers for $190,000 on very good terms, but the deal fell through. Cliff Hudson testified that the $190,000 offer was the lowest he had.

It is not clear whether Mr. Dick's valuation took into account the station's reputation in its market or only the statistics of its market. Certainly a valuation should be based on the station's potential, and that depends in part on its reputation. Mrs. Davis testified that the station had and continues to have a bad reputation among its potential customers.

Mr. Dick also admitted that the salability of the station had diminished in the summer of 1981 because of the poor state of the economy generally and because of high interest rates.

Cliff Hudson paid $150,000 for the station in 1975, six years before the transfer in question. He also agreed to sell Mrs. Davis a one-half interest in 1978 for $75,000. The $150,000 sale price in 1981 was apparently set mostly according to debts owed to Mrs. Davis and Lee Cooper. The court cannot believe that the station was worth $350,000 or even $300,000 at the time of the sale in question.

There was no evidence that $150,000 was a low price for the station when Hudson bought it in 1975. Hudson did not operate the station at a profit before Mrs. Davis became involved in 1978 or afterward. Furthermore, his poor management appears to have caused a decline, or at least a lack of growth, in the station's revenues.

The proposed sale for $300,000 was not completed because the potential buyers refused to go through with it. Hudson's subsequent offers to sell at lower prices and on reasonable terms never produced a custom-

er who came close to consummating a purchase. Though the Davises killed a proposed sale to Kincaid, they did so justifiably in light of the amounts owed Mrs. Davis. Finally, the $350,000 value was determined about a year before the sale and apparently did not take into account any intervening changes in the station's "market", including its worsening reputation. Mr. Dick did admit that the salability of the station for $350,000 had declined because of higher interest rates. This is a backhanded way of saying that the station could no longer be sold for $350,000.

Even allowing for the general effect of inflation on prices, the court cannot believe that from 1975 to 1981 the station doubled in value. Indeed, it appears that the value of the station probably declined. Furthermore, the $150,000 price in the sale in question appears to have been set according to what was owed Mrs. Davis and Lee Cooper, rather than according to the market value of the station, which could have been lower. It does not appear that the Davises coerced this sale at a low price by threatening Hudson with criminal prosecution. Hudson had already decided to sell the station but had been unable to find a buyer at a higher price.

The court concludes that the station was worth $75,000 at the time of the sale. At that value, it was worth more than the mortgage debt to Lee Cooper, which was the about $65,000.00. There was no proof that the station was subject to other perfected liens. The result is that the value of the station in excess of Cooper's mortgage debt, the "equity" in the amount of about $10,000, was transferred to Mrs. Davis in payment of the $32,300 note.

■ The court has already decided that the sale occurred within the 90-day preference period. It appears that the other preference requirements are also satisfied. Mrs. Davis was clearly preferred. The transfer of the station deprived the debtor of assets with which to pay other creditors while paying Mrs. Davis a third of the debt to her.

Mrs. Davis argued that the transfer should be excepted from avoidance by § 547(c)(1), which provides:

(c) The trustee may not avoid under this section a transfer—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.

"New value" is defined in section 547(a)(2):

(a) In this section—

\* \* \* \* \* \*

2) "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, but does not include an obligation substituted for an existing obligation;

. . . .

The debt was incurred several months before the sale, and thus, there was no contemporaneous exchange to the extent that the equity in the station was transferred to pay the debt.

The court concludes that the sale resulted in an avoidable preferential transfer to Mrs. Davis. For reasons set forth later, the court need not decide whether or not the sale was a fraudulent transfer because it resulted in payment of $46,000 owed by Cliff Hudson rather than the debtor.

■ The Davises have rightly argued that the court cannot order the FCC to transfer the broadcast license to the trustee in bankruptcy. The trustee, therefore, cannot recover the asset transferred, the radio station as a going business. This does not mean the trustee cannot recover anything. He is entitled to recover the value of the assets transferred. Bankruptcy Code section 550(a) provides:

(a) Except as otherwise provided in this section, to the extent that a transfer is

avoided under section 544, 545, 547, 548, 549 or 724(a) ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property ....

Since the trustee is entitled to recover the value of the property transferred under either the preferential transfer or the fraudulent transfer statute, there is no need to consider whether there was a fraudulent transfer. Furthermore, Mrs. Davis is entitled to retain the property itself. The court will decree that Mrs. Davis is the owner of radio station WEDG–AM.

Bankruptcy Code § 550(d) provides that a good faith transferee is entitled to a lien against the property recovered for the lesser of (1) the cost of improvements made after the transfer and (2) any increase in the value of the property resulting from such improvements. Obviously, this provision does not apply when the improved property will be retained by the transferee and the trustee will recover a money judgment for the value of the property. 4 Collier on Bankruptcy ¶ 550.05 (15th ed. 1982).

Does the trustee recover the value at the time of the transfer or at the time of the recovery? The provision giving the transferee a lien for improvements suggests that when the trustee recovers the value of the property, he should recover the greater of (1) the value at the time of the transfer and (2) the value at the time of recovery less a deduction for the amount in which the transferee would have a lien if the trustee recovered the property.

In this proceeding, the court must necessarily focus on the value of the property at the time of the transfer. The evidence is insufficient to do otherwise. The evidence also suggests that any increase in value after the sale would be attributable to improvements made by Mrs. Davis.

There should be deducted from the recoverable value the amount of the mortgage debt to Lee Cooper. The debt will be discharged. The property subject to the debt will be retained by Mrs. Davis, who assumed an obligation to pay the debt and must pay it in order to keep the property.

The result is that the trustee is entitled to recover the value of the station at the time of the sale less the amount of the debt to Lee Cooper: $75,000 − $65,244.14 = $9,755.86. There must also be deducted the $1,073.15 of the sale proceeds already paid to the trustee: $9,755.86 − $1,073.15 = $8,682.71.

The court will enter an order adjudging Mrs. Davis liable to the trustee in this amount and awarding her the property transferred.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 752.