## In re AUDIO VISUAL WORKSHOP, INC., Debtor.

### Bankruptcy No. 97 B 42775 (JLG).

United States Bankruptcy Court,
S.D. New York.

July 25, 1997.

---

Capetanakis & Preite, Brooklyn, NY, for Alleged Debtor.

Tenzer, Greenblatt, L.L.P., New York City, for Times Circle Associates.

### MEMORANDUM DECISION ON DEBT-OR'S OBJECTIONS TO AND MOTION TO DISMISS TIMES CIRCLE ASSO-CIATES' INVOLUNTARY CHAPTER 7 PETITION UNDER 11 U.S.C. § 305(A)(1)

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Audio Visual Workshop, Inc. ("Alleged Debtor") objects to the entry of an order for relief in this involuntary chapter 7 case and moves pursuant to § 305 of the Bankruptcy Code to dismiss it. Times Circle Associates ("Times Circle"), one of three petitioning creditors, opposes the motion. We grant it.

#### Facts

The facts are not in dispute. Alleged Debtor formerly leased and rented audio and visual recording equipment. On or about May 17, 1990, Times Circle, as landlord, and Alleged Debtor, as tenant, executed identical leases (collectively, the "Lease") for two floors of a building located at 333 West 52 nd Street (the "Premises"). On or about February 19, 1997, prior to the filing of the involuntary petition, Times Circle commenced two summary proceedings against Alleged Debtor in New York County Civil Court–Landlord–Tenant Commercial Part 52, seeking to collect arrears from Alleged Debtor comprised of base rent, cost of living adjustments ("COLA") and/or electricity charges. Alleged Debtor moved to dismiss those actions on procedural grounds without challenging the validity of Times Circle's calculation of the COLA or electricity charges. The court denied both motions.

Alleged Debtor vacated the Premises and on April 29, 1997 (the "Petition Date"), Times Circle, Manny's Music and Edisys Video Rentals, Inc. commenced this involuntary case. Times Circle asserts a claim for $103,-679.13 for unpaid prepetition rent comprised of base rent, COLA and/or electricity charges. Manny's Music and Edisys Video Rentals assert undisputed claims of $1,047.95 and $1,123.50, respectively.

On March 28, 1997, Alleged Debtor and KVL Audio Visual Services–NY, Inc. ("KVL") executed a bulk sale agreement ("Bulk Sale Agreement") pursuant to Article 6 of the New York Uniform Commercial Code ("N.Y.U.C.C."). Under that agreement, Alleged Debtor sold KVL its name and all of its accounts receivable, inventory, furniture, fixtures and equipment, telephone numbers, customer lists and files, vendor lists and files, computer software, equipment manuals, service manuals, schematics, miscellaneous intangibles and spare parts. *See* Bulk Sale Agreement Schedule 3.1.6. The sale closed on April 30, 1997—one day after the Petition Date. When distributed, the sale proceeds will fully satisfy the claim of European American Bank ("EAB"), Alleged Debtor's only secured creditor, and pay approximately 10% to unsecured creditors. The consideration to the Alleged Debtor under the agreement consists of:

(i) cash payment of $388,000;

(ii) the assumption of approximately $210,-000 in liabilities, consisting of debt arising from lease obligations on equipment to Rockford Indus., Inc., GE Capital Corp., and Minolta Company; and

(iii) payment of all cash shortfalls between the date of the Agreement (March 28, 1997) and the closing date (April 30, 1997).

Additionally, KVL agreed to employ 20 of Alleged Debtor's personnel, including Joseph Sorrento for a two year period at an annual salary of $62,200, plus commissions, and Charles Spataro, Sr. and Charles Spataro, Jr., Alleged Debtor's President and Vice President, for 18 month periods at annual salaries of $132,754 and $72,600, respectively.

Time Circle contends that we must deny this motion because the fact of the bulk sale proves that Alleged Debtor is not paying its bills as they become due and because its claim is not the subject of a bona fide dispute

since Alleged Debtor cannot assert a defense to it. *See* 11 U.S.C. § 303(h)(1).[1]

Alleged Debtor does not contend that it has been paying its debts as they become due. It objects to the involuntary petition because Times Circle's claim purportedly is the subject of a bona fide dispute. It seeks to dismiss this case pursuant to § 305 of the Bankruptcy Code because:

- its business and assets have been duly and legally liquidated under New York States's bulk transfer law;
- Times Circle neither sought the appointment of an interim trustee nor the issuance of an order barring the bulk transfer from this Court, *see* 11 U.S.C. § 303(f), (g); [2]
- bulk transfers are authorized under §§ 303(f) and 549(b) of the Bankruptcy Code;
- the bulk sale proceeds will yield a 10% distribution to unsecured creditors and full payment of EAB's secured claim; and
- there are no assets for a chapter 7 trustee to administer.

### Discussion

We base our subject matter jurisdiction of this contested matter on 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a

1. In relevant part, § 303(h)(1) states:

   If [an involuntary] petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—
     (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute[.]
   11  U.S.C. § 303(h)(1).

2. Section 303(f) and (g) state:

   (f) Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an invol-

core proceeding. *See* 28 U.S.C. § 157(b)(2)(A), (O).

■■■■  Section 303(b)(1) of the Bankruptcy Code provides, in pertinent part:

An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

> by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute[.]

11 U.S.C. § 303(b)(1). The Bankruptcy Code does not define the term "bona fide dispute". *See, e.g., B.D. Int'l Discount Corp. v. Chase Manhattan Bank, N.A. (In re B.D. International Discount Corp.),* 701 F.2d 1071 (2d Cir.), *cert. den.* 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983); *In re All Media Properties, Inc.,* 5 B.R. 126 (Bankr.S.D.Tex. 1980), *aff'd,* 646 F.2d 193 (5th Cir.1981). However, if there is a genuine issue of material fact that bears upon the debtor's liability to the petitioning creditor, or a meritorious contention as to the application of law to undisputed facts, the claim is subject to a bona fide dispute. *In re Elsa Designs, Ltd.,* 155 B.R. 859, 863–65 (Bankr.S.D.N.Y.1993); *In re Busick,* 831 F.2d 745, 747 (7th Cir.1987) (quoting *In re Lough,* 57 B.R. 993 (Bankr. E.D.Mich.1986)). We must determine

untary case concerning the debtor had not been commenced.
   (g) At any time after the commencement of an involuntary case under chapter 7 of this title but before an order for relief in the case, the court, on request of a party in interest, after notice to the debtor and a hearing, and if necessary to preserve the property of the estate or to prevent loss to the estate, may order the United States trustee to appoint an interim trustee under section 701 of this title to take possession of the property of the estate and to operate any business of the debtor. Before an order for relief, the debtor may regain possession of property in the possession of a trustee ordered appointed under this subsection if the debtor files such bond as the court requires, conditioned on the debtor's accounting for and delivering to the trustee, if there is an order for relief in the case, such property, or the value, as of the date the debtor regains possession, of such property.
   11  U.S.C. §§ 303(f), (g).

whether there is an objective basis for either a substantial factual or legal dispute as to the validity of the debt. *Busick*, 831 F.2d at 750; *In re Nargassans*, 103 B.R. 446, 449 (Bankr. S.D.N.Y.1989).

■ The phrase "not ... subject of a bona fide dispute" is both an element of the condition upon which a controverted order for relief may be entered and a prerequisite for our jurisdiction. *See In re Onyx Telecommunications, Ltd.*, 60 B.R. 492, 496 (Bankr.S.D.N.Y.1985). As the party asserting jurisdiction, Times Circle must establish it. *In re Secured Equipment Trust of Eastern Air Lines, Inc.*, 153 B.R. 409, 412 (Bankr.S.D.N.Y.1993).

> The petitioning creditor must establish a prima facie case that no bona fide dispute exists. Once this is done, the burden shifts to the debtor to present evidence demonstrating that a bona fide dispute does exist.

*In re Elsa Designs, Ltd.*, 155 B.R. at 863. To qualify as a petitioning creditor with a claim not subject to a bona fide dispute a claimant need only " 'establish ... that there are good grounds for the claim and that no defenses have been asserted in substantiable form.' " *See In re Nargassans*, 103 B.R. at 449 (citing *In re B.D. Int'l. Discount Corp.*, 701 F.2d at 1077); *In re Tampa Chain Co., Inc.*, 35 B.R. 568, 575 (Bankr.S.D.N.Y.1983). *See also In re Johnston Hawks, Ltd.*, 49 B.R. 823, 830 (Bankr.D.Haw.1985) ("[a] bona fide dispute is a conflict in which an assertion of a claim or right made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith and without fraud or deceit on the other side."); *In re Stroop*, 51 B.R. 210, 212 (D.Colo.1985) (if the defense of the alleged debtor to the claim of the petitioning creditor raises material issues of fact or law so that "a summary judgment could not be rendered as a matter of law in favor of the creditor on a trial of the claim, the claim is subject to a bona fide dispute").

■ Alleged Debtor admits that as of April 3, 1997, it owed Times Circle $122,748.29. *See* Certified List Of Creditors Of Audio Visual Warehouse, Inc. Prepared Pursuant to N.Y.U.C.C. § 6–104 ("Certified List

of Creditors"), annexed as Exhibit G to the affidavit of Daniel W. Dowe, Esq. ("Dowe Aff.") submitted in support of motion. Nonetheless, it argues that Times Circle's claim is the subject of a bona fide dispute because Times Circle purportedly overtaxed Alleged Debtor for COLA and electricity charges during the six years the Lease was in effect, giving rise to a counterclaim that will more than offset Time Circle's rent claim under the Lease. Times Circle denies those allegations and argues that § 26 of the Lease bars Alleged Debtor from interposing them. That paragraph states:

> It is mutually agreed by and between Owner and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this lease, the relationship of Owner and Tenant, Tenant's use of or occupancy of said premises, and any emergency statutory or any other statutory remedy. *It is further mutually agreed that in the event Owner commences any summary proceeding for possession of the premises, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding.*

Lease § 26 (emphasis added). This provision is inapposite because this is not a summary proceeding to recover possession of the Premises. *Compare 99 Commercial Street, Inc. v. Llewellyn*, —— A.D.2d ——, ——, 658 N.Y.S.2d 130, 131 (1997) (a summary proceeding is an action pursuant to N.Y. REAL PROP. ACTS. § 711 (McKinney 1997) for the nonpayment of rent).

■ Alleged Debtor's counterclaim does not make Time Circle's otherwise undisputed claim the subject of a bona dispute. If established, the counterclaim and corresponding setoff will be relevant under § 303(b)(1) in determining the amount of Times Circle's claim or under § 303(h)(1) in determining whether Alleged Debtor is generally paying its debts as they become due. *See In re Ross*, 63 B.R. 951, 959 n. 9 (Bankr.S.D.N.Y. 1986); *In re Drexler*, 56 B.R. 960, 968–69

(Bankr.S.D.N.Y.1986); *Harris v. Capehart–Farnsworth Corp.*, 225 F.2d 268, 270 (8th Cir.1955) (alleged bankrupts should be allowed to establish set-offs and counterclaims which they are lawfully entitled to use in diminution and extinguishment of petitioning creditor claims); *Georgia Jewelers, Inc. v. Bulova Watch Co.*, 302 F.2d 362, 369 (5th Cir.1962) (counterclaims have a limited utility in the bankruptcy scheme and that is such may be asserted to reduce either dollar amount of claims, or the number of creditors below the statutory minimum for involuntary relief); *In re Kreidler Import Corp.*, 4 B.R. 256, 259 (Bankr.D.Md.1980) (a bona fide counterclaim which exceeds the amount of a claim extinguishes the claim for the purposes of filing involuntary petition). Because Alleged Debtor relies solely on the purported counterclaim in arguing that Times Circle's claim is the subject of a bona fide dispute, we find no merit to that objection to the involuntary petition. Nonetheless, we will consider whether the counterclaim disqualifies Times Circle under § 303(b) from being a petitioning creditor. We do not consider how the counterclaim may impact on Times Circle

**3.** That clause states:

If the landlord elects to supply electric current to the demised premises, the tenant agrees that electric current will be supplied by the landlord and the tenant will pay the landlord ... as additional rent for the supplying of electric current, an amount or amounts set by the landlord computed at rates not exceeding those in the Service Classification No. 4 of Consolidated Edison Company of New York, Inc. in effect.... The landlord at his option may, however, increase the additional rent charged for supplying electricity to the demised premises based upon changes, occurring subsequent to the aforementioned date, in the method, rates or manner by which the landlord thereafter purchases electricity for the building of which the demised premises are a part. Such increases in the additional rent charged for electricity shall be determined by a comparison to the nearest full percentage of the average cost per kilowatt hour to the landlord at the rate in effect at which landlord purchased electricity prior to such change and the rate under which the landlord will purchase electricity after such change. The periods to be used for the aforesaid computation shall be the bill periods ended in February and August immediately preceding such change. Average cost per kilowatt hour is defined as including energy charges, demand charges, fuel adjustment charges, rate adjustment

under § 303(h) because Alleged Debtor does not contend that it has been paying its debts as they become due.

Additional Clause No. 45 of the Lease[3] governs Times Circle's right to charge Alleged Debtor for electricity under the Lease. Pursuant to sections (c)(1) and (c)(2) of the Lease's Real Estate Taxes and Cost of Living Rider (the "Rider"), Times Circle collects COLA as additional rent on a quarterly basis. Under section (c)(2), Times Circle must furnish Alleged Debtor with a detailed analysis of how it arrives at those charges. Section (c)(3) of the Rider provides the methodology for calculating the COLA.[4]

■ Times Circle argues that section (d) of the Rider bars Alleged Debtor's challenge to the COLA charges. That provision states:

The statements of ... the cost of living adjustments to be furnished by Landlord as provided in subsections (b) and (c) above shall consist of data prepared for the Landlord by a firm of Certified Public Accountants ... the statements thus furnished to Tenant shall constitute a final

charges, sales taxes where applicable, and/or any other factors used by the public utility in computing its charges to the landlord, applied to the kilowatt hours purchased by landlord during a given bill period. Where more than one meter measures the service of tenant, the service rendered through each meter may be computed and billed separately in accordance with the rates herein.... It is further agreed by tenant that all of the aforesaid costs and expenses are chargeable and collectible as additional rent....
Additional Clause No. 45.

**4.** That clause states:

For each such installment, there shall be computed a "Percentage Adjustment Fraction," which shall be a fraction whose denominator is the Consumer Price Index and whose numerator is the Installment Index less the Base Price Index. The fraction thus determined shall be multiplied by the Base Rent thereto paid or payable by Tenant attributable to such Annual Adjustment Period, and from this sum shall be subtracted any amounts theretofore paid or payable by Tenant, pursuant to this subsection, attributable to said Annual Adjustment Period. The resultant sum shall constitute the quarterly installment of cost of living adjustment which shall be immediately due and payable as additional rent.
Rider § (c)(3).

determination as between Landlord and Tenant of ... cost of living adjustments for the periods represented thereby.

Rider § (d). However, that clause does not preempt Alleged Debtors's set-off claim. *See Sage Realty Corp. v. Insurance Co. of North America,* 34 F.3d 124 (2d Cir.1994) (lease provision that landlord's certified public accountant's determination of additional rent and expenses was a final determination binding on both parties was not enforceable as to tenant's counterclaims concerning the calculation of additional rent and expenses); *Newmark & Co. Real Estate Inc. v. C & A Trimming Corp.,* 134 Misc.2d 371, 373, 511 N.Y.S.2d 205, 207 (Civ.Ct.1987) (where rent escalation clause provides that a statement consisting of "data prepared for the Lessor by a firm of Certified Public Accountants" will be furnished to the tenant which statement shall compute the additional rent and which "shall constitute a final determination ... of the real estate taxes and operating expenses for the period represented thereby" it is nevertheless "subject to the right of the tenant to demonstrate, in a plenary action, that the computation was made in error or was made fraudulently".).

■ As support for its allegations that the COLA and electricity provisions of the Lease are ambiguous and that Times Circle miscalculated and inflated those charges in each of the six years the Lease was in effect, Alleged Debtor submitted Charles P. Spataro, Jr.'s affidavit ("Spataro Aff."). He states, as follows:

Time Circle has both inflated and miscalculated the charges for electricity under the leases. Again, the Alleged Debtor has paid these inflated and erroneous charges over the past six years during which the leases were in effect, and is now entitled to a refund.

The Alleged Debtor has not calculated the total amount of the refund which is due to the Alleged Debtor because we do not have all of the necessary documentation. However, it appears that the refund will be greater than the rent claimed by Time Circle up to the point the Alleged Debtor surrendered possession of the premises.

Spataro Aff. ¶¶ 6, 7. Times Circle denies that the Lease is ambiguous or that it has overcharged Alleged Debtor thereunder. Spataro's self-serving and conclusory statements shed no light on the purported rent dispute. Alleged Debtor's counterclaim is not conclusive as a matter of law. Because it cannot be resolved without the adjudication of substantial legal and factual issues, it does not disqualify Times Circle from being a petitioning creditor under § 303(b). *See In re All Media Properties, Inc.,* 5 B.R. at 134–35; *In re North County Chrysler Plymouth,* 13 B.R. 393, 398 (Bankr.W.D.Mo.1981).

■ In assessing Alleged Debtor's request pursuant to § 305 of the Bankruptcy Code that we dismiss this case, we are guided by what is in the best interests of all creditors. In relevant part, § 305(a) states:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension[.]

11 U.S.C. § 305(a)(1).

■ A relevant consideration is whether there are pending arrangements that will equitably satisfy creditor claims and not unduly burden or prejudice the debtor. *In re RAI Marketing Services, Inc.,* 20 B.R. 943, 946 (Bankr.D. Kan.1982). The legislative history counsels that we may dismiss a case pursuant to § 305(a)(1):

if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case.

H.R. 95–595, 95th Cong. 1st Sess. 325 (1977). S.R. No. 95–989, 95th Cong.2d Sess. 36 (1978), *reprinted in* U.S.C.C.A.N. pp. 5787, 6281, 5822 (1978). *See also Hartigan v. Pine Lake Village Apartment Co. (In re Pine Lake Village Apartment Co.),* 16 B.R. 750, 753 (Bankr.S.D.N.Y.1982); *In re Artists'*

*Outlet, Inc.,* 25 B.R. 231, 232 (Bankr.D.Mass. 1982).

■ Thus, courts will dismiss an involuntary case under § 305(a)(1) if: (1) the petition was filed by a few recalcitrant creditors and most creditors oppose the bankruptcy; (2) there is a state insolvency proceeding or an out-of-court arrangement pending; and (3) dismissal is in the best interest of the debtor and all creditors. *See In re Trina Assocs.,* 128 B.R. 858 (Bankr.E.D.N.Y.1991); *In re Sherwood Enterprises, Inc.,* 112 B.R. 165 (Bankr.S.D.Tex.1989); *In re RAI Marketing Services, Inc.,* 20 B.R. 943; *In re Luftek,* 6 B.R. 539 (Bankr.E.D.N.Y.1980). *See also In re Fax Station, Inc.,* 118 B.R. 176, 177 (Bankr.D.R.I.1990) (expanding list of criteria relevant to § 305(a) motion to include: (1) economy and efficiency of administration; (2) whether another forum is available to protect the interest of both parties or there is already a pending proceeding in a state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving the equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interest in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which jurisdiction has been sought); *In re RCM Global Long Term Capital Appreciation Fund,* 200 B.R. 514, 525 (Bankr. S.D.N.Y.1996) (applying four of the seven *Fax Station* factors in denying dismissal of an involuntary case pursuant to § 305(a)(1)). *See e.g., In re M. Egan Co., Inc.,* 24 B.R. 189 (Bankr.W.D.N.Y.1982) (granting Alleged Debtor's motion to dismiss involuntary petition under § 305 where debtor had assigned all of its assets under state law, there was no showing of impropriety connected with the sale, and any allegations of improprieties by the assignee could be taken care of in state court); *Matter of Bioline Laboratories, Inc.,* 9 B.R. 1013 (Bankr.E.D.N.Y.1981) (granting debtor's motion to dismiss involuntary chapter 11 petition under § 305 where trade creditors filed involuntary petition to enjoin bulk

sale but did not present any better alternatives).

Times Circle does not deny that the first two of the three factors enumerated in *Trina Associates* are present here. The Bulk Sale Agreement constitutes an out-of-court arrangement that has been noticed and consummated pursuant to the N.Y.U.C.C., without objection by Times Circle or any other creditor. A few recalcitrant creditors have brought this case. In its Certified List of Creditors, Alleged Debtor admits to having approximately 215 creditors with claims aggregating approximately $485,000. The vast majority of creditors hold claims of less than $4,000. Times Circle holds the second largest claim in the case. However, there are several creditors with relatively large claims that have not joined the petition. They are: New York State ($45,000), Albert L. Berstein ($24,250), Ram Trucking ($22,761.50), Wells Fargo Bank ($21,209.74), New York Empire ($19,939.30), Fleetwood ($17,833.16), The Waveform Group ($15,965.91), and Brown Raysman & Milstein ($10,520.21).

The uncontested Dowe affidavit summarizes the facts relating to Alleged Debtor's decision to conduct the bulk sale and the events leading up to the execution of the Bulk Sale Agreement. In March 1996, Alleged Debtor retained Dowe to review its business, prepare a selling memorandum and market the company. Dowe Aff. ¶ 3. Between March and July, 1996, Alleged Debtor contacted the following seven prospective buyers on a highly confidential basis about purchasing its assets in a bulk sale transaction: Bauer Audio Visual, Inc., Audio Visual Headquarters, Wexford Capital Management, Mr. Scott Christensen, CE Capital Technology, Heckler Electric Company, and Caribiner International, Inc. ("Caribiner"). *Id.* ¶ 4. Alleged Debtor originally sought to consummate a transaction with Caribiner and discussed with it the possibility of a sale, but the parties did not reach an agreement. *Id.* ¶ 5. From July to September, 1996, Alleged Debtor spoke with each of the seven potential purchasers on several occasions in an attempt to generate interest in Alleged Debtor's assets. After reviewing Alleged Debtor's financial statement for 1992–1995, Audio

Visual Headquarters and Wexford Capital expressed no interest in the transaction. Each of the remaining five entities conducted some due diligence but none submitted a bid to the Alleged Debtor. *Id.* ¶ 6. By April 1996, Alleged Debtor was operating under considerable financial distress and that month it obtained approximately $320,000 in credit from EAB for working capital, which it used to acquire new equipment and pay down liabilities. *Id.* ¶ 7. In October, 1996, Alleged Debtor identified 119 potential buyers. *Id.* ¶ 8, Ex. B. On November 18–19, 1996, it mailed each of them a term sheet on the Alleged Debtor without disclosing its identity. *Id.* ¶ 9, Ex. C. The following 12 entities responded to the term sheet and requested additional information: KVL, Modern Mass Media, Visual Sound, LMG, Inc., Design Audio Visual Company, Specialized Audio Visual, Long Island Video Enterprises, Audio Visual Associates, Alford Media Services, Mobile Wall One, Inc., All City Prompting and HB Group Inc. *Id.* ¶ 10. Alleged Debtor provided each of those entities with its financial statements for 1992–1996 and a selling memorandum. Additionally, its representatives spent considerable time on the telephone with representatives of each entity and attended several due diligence meetings at the Alleged Debtor with representatives of Mobile Wall One, Modern Mass Media, and KVL. *Id.* ¶ 11. On January 31, 1997, as a result of a separate solicitation, Total Audio Visual Services ("TAVS") made a written offer to acquire all of Alleged Debtor's inventory of 2,500 pieces of equipment for $195,000 or 1,815 pieces of equipment for $228,000. *Id.* ¶ 12, Ex. D. Alleged Debtor rejected that offer. During January and February, 1996, KVL began negotiating with Alleged Debtor. As part of those negotiations, KVL retained an independent business appraiser, `Caspert Management Co., Inc. ("Caspert"), to appraise Alleged Debtor's furniture, fixtures and equipment as a forced sale and at fair market value. Caspert fixed the forced sale and fair market values at $250,000 and $425,000, respectively. *Id.* ¶ 13. On March 28, 1997, Alleged Debtor and KVL executed the Bulk Sale Agreement. The Dowe Affidavit summarizes that:

over the course of approximately nine months (July 1996 to March 1997) we contacted 126 companies located throughout the United States in our effort to sell the Alleged Debtor. The initial asking price was $2.5 million which was based on a multiple of 5–6 times pro forma earnings. Although the initial value was known to be high for a company having financial distress and a substantially obsolete inventory, we marketed the company at this price because the Alleged Debtor sought that amount, and in most private deals the original asking price is generally high to leave room for negotiations. However, since the Alleged Debtor's cash flow situation was rapidly deteriorating the sale price declined substantially.

*Id.* ¶ 16. Alleged Debtor decided not to file a voluntary petition because it feared that it would seriously impair its business dealings with its vendors, customers and employees, and that the company would be liquidated without salvaging its going concern value or preserving the jobs of its 20 employees. *Id.* ¶ 18.

Notwithstanding Dowe's uncontested testimony, Times Circle denies that the dismissal of this case is in the best interest of the Alleged Debtor and all creditors. It urges us to enter an order for relief and appoint a chapter 7 trustee to investigate the bulk sale transaction. Times Circle argues that a trustee may find that pursuant to § 549(b) of the Bankruptcy Code, the Alleged Debtor did not receive equivalent value for the bulk transfer and then, presumably pursuant to § 550 of the Bankruptcy Code, recover the assets transferred in excess of that value or be compensated therefor.

In substance, § 549(a) empowers a trustee to avoid post-petition transfers of estate property. 11 U.S.C. § 549(a). Section 549(b) limits that power, as follows:

In an involuntary case, the trustee may not avoid under subsection (a) of this section a transfer made after the commencement of such case but before the order for relief to the extent any value, including services, but not including satisfaction or securing of a debt that arose before the commencement of the case, is given after the com-

mencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has.

11 U.S.C. § 549(b). In relevant part, § 550(a)(1) states:

[T]o the extent that a transfer is avoided under section ... 549 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property from

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made ...

11 U.S.C. § 550(a)(1).

Times Circle speculates that debtor's initial proposal to sell its assets for $2.5 million may have chilled the bidding because a business like the Alleged Debtor's that purportedly was generating in excess of $2 million in gross profits and $500,000–$600,000 in earnings annually, with inventory and accounts receivable booked at $2.7 million and $250,000, respectively, is worth more than the $388,000 cash paid to debtor. It contends that the cash portion of the consideration paid under the agreement is the full measure of "value" for purposes of § 549(b), and that Alleged Debtor failed to maximize "value" because:

☐ the assumption of $210,000 in lease liabilities provides no benefit to creditors;

☐ KVL's assumption of certain Mercedes and BMW automobile leases at $1,437 and $789 per month respectively, solely to the benefit of Alleged Debtor's principals and reduced the value to creditors herein;

☐ the retention of employees did not constitute value to the estate; and

☐ the 18 month employment agreements entered into with the Alleged Debtor's principals was a cost of acquisition considered by KVL when determining the price paid for the assets thus reducing the cash available for distribution to creditors.

Additionally, it contends that Alleged Debtor had a duty to reach its own conclusions as to value and should not have relied on the Caspert appraisal.

Times Circle does not suggest, let alone show, that the Caspert appraisal is flawed in any way. Thus, we find no merit to its assertion that Alleged Debtor erred in using that appraisal in negotiating the Bulk Sale Agreement. Moreover, there is no support for Times Circle's assertion that KVL would have paid more cash for Alleged Debtor's assets if it had not retained its work force. Finally, Alleged Debtor denies that KVL assumed automobile leases for the benefit of Alleged Debtor's principals and Times Circle has not shown that it did. Under § 549(b), "value" does not include "satisfaction or securing of a debt that arose before the commencement of a case ..." 11 U.S.C. § 549(b). Thus, in determining whether the Bulk Sale Agreement comes within § 549(b)'s safe harbor, we exclude the value of KVL's payment of Alleged Debtor's cash flow between the execution and closing of the bulk sale and the $210,000 in lease payments that KVL assumed. *See Allen v. Rib Detention Equipment, Inc. (In re Roanoke Iron & Bridge Works, Inc.),* 98 B.R. 256, 260 (Bankr. W.D.Va.1988) (rejecting argument that assumption of prepetition liabilities benefits the estate because it protects debtor from potential claims for breach of those leases). *See also Cossitt v. First American State Bank (In re Fort Dodge Creamery Co.),* 121 B.R. 831, 835 (Bankr.N.D.Iowa 1990) ("Section 549(b) is intended to protect contemporaneous exchanges for value to permit continued operation of the business during the 'gap' period. It is not intended to protect post-commencement payment of pre-petition debt."); *Matter of Int'l Teldata Corp.,* 12 B.R. 879, 882 (Bankr.D.Nev.1981) (payments in satisfaction of ongoing prepetition business debts are avoidable under § 549(b)). We also exclude the value of the salaries of Alleged Debtor's former employees who will be retained by KVL. *See Hamilton v. Lumsden (In re Geothermal Resources Int'l, Inc.),* 93 F.3d 648, 651 (9th Cir.1996) (" ' "Value" under § 549(b) requires proof of services *performed* not services *promised,* during the involuntary gap period.' " [Emphasis original]) (quoting *McManus, Stewart, Ferraro & Schwarz, P.A. v. Bakst (In re Sanchez–Casis),* 99 B.R. 115, 117 (Bankr.S.D.Fla. 1989)).

In determining whether KVL gave value under the Bulk Sale Agreement, we must

determine whether the $388,000 cash is disproportionate to the value of the assets it received. *See In re Sanchez–Casis*, 99 B.R. at 116 ("The obvious legislative purpose of § 549(b) is to give credit to a transferee to the extent that the bankrupt estate has received equivalent value for the transfer, and, therefore, has not been depleted."); *Modern Settings, Inc. v. Prudential–Bache Securities, Inc.*, 1988 WL 49056 (S.D.N.Y.) (bulk transfer for fair equivalent value was sufficient to defeat fraudulent conveyance claim). In *Murdock v. Plymouth Enterprises, Inc. (In re Curtina Int'l, Inc.)*, 23 B.R. 969, 979 (Bankr.S.D.N.Y.1982), the court had to determine whether a bulk transfer of "not-too-fresh" wafers was for reasonably equivalent value for purposes of finding a fraudulent transfer under § 548 and New York Debtor and Creditor Law § 273. The court found the sale was for reasonably equivalent value where debtor had sold the wafers in

> a straight arms-length non-collusive sale for consideration determined by what a close-out specialist was willing to pay for the debtor's line of wafers after unsuccessful efforts by the debtor to dispose of the not-too-fresh wafers by selling them to other potential purchasers of distressed merchandise.

*Id.* at 975. *See also Roth v. Fabrikant Bros. (In re Flato)*, 175 F.2d 665, 667 (2d Cir.1949) (court may consider other bids, failed negotiations for the assets, that the assets were difficult to dispose of and circumstances of the debtor at the time of the sale, in addition to actual price paid in deciding if fair consideration has been given under § 548); *Wood v. Davis (In re Southeast Community Media, Inc.)*, 27 B.R. 834, 843 (Bankr.E.D.Tenn. 1983) (finding that debtor sold radio station for reasonably equivalent value where it was unable to find a buyer at a higher price, business was deteriorating, and there was no evidence that the sale was coerced).

Times Circle wants a chapter 7 trustee to test whether the $388,000 cash paid by KVL to Alleged Debtor is sufficient value to bring the Bulk Sale Agreement within § 549(b)'s safe harbor. There are no assets for a chapter 7 trustee to administer other than that proposed litigation and we find that it has dubious merit, at best. The undisputed evidence shows that in structuring the bulk sale, Alleged Debtor did not engage in self dealing and that the sale is an arms-length transaction. Times Circle speculates that Alleged Debtor chilled the bidding for its assets by fixing its initial price at $2.5 million. However, Dowe's unchallenged testimony shows that Alleged Debtor had a reasonable basis for doing so, and that Alleged Debtor extensively marketed its assets pursuant to a carefully structured program that was overseen by outside counsel and calculated to maximize the return on Alleged Debtor's assets. Times Circle adduced no evidence to support its assertion that the Alleged Debtor's assets are worth more than the $338,000 cash paid by KVL and the proof shows otherwise. The cash payment is $143,000 more than *TAVS's* offer to purchase all of Alleged Debtor's inventory and is $110,000 better than TAVS's best offer. It is on the high side of the range of values contained in the Caspert appraisal. We note that both the TAVS offer and the appraisal exclude Alleged Debtor's accounts receivable. Without adducing any evidence, Times Circle contends that we should assume that they are 100% collectible. Debtor denies that its receivables should be so valued. We sharply discount receivables in situations like this where the payee will terminate its operations. In light of the circumstances of this case, we find it unlikely that a trustee could demonstrate that the Bulk Sale Agreement falls outside § 549(b)'s safe harbor. The sale proceeds, net of the secured claim, are the only funds available to compensate a chapter 7 trustee. Thus, it is plainly in the best interests of creditors to dismiss this case.

Moreover, Times Circle is not without a remedy. It can challenge the propriety of the bulk sale in state court pursuant to New York's Debtor and Creditor Law. *See, e.g., Sunrise Industrial Joint Venture v. Ditric Optics, Inc.*, 873 F.Supp. 765, 772 (E.D.N.Y. 1995) (plaintiff alleged cause of action to set aside bulk sale under N.Y. DEBT & CRED. §§ 275, 276, 276–a); *Leventhal v. Spillman*, 234 F.Supp. 207, 209 (E.D.N.Y.1964) (holding that bulk transfer was a fraudulent conveyance under N.Y. DEBT & CRED. § 276 and must be set aside), *aff'd*, 362 F.2d 264 (2d Cir.1966). It has ample time to do so. *See* N.Y.U.C.C. § 6–111 (statute of limitations is

six months after the date on which the transferee took possession of the goods).

To summarize, we find that this case should be dismissed pursuant to § 305(a) of the Bankruptcy Code because (i) it was commenced by a few recalcitrant creditors, (ii) it is unnecessary and duplicative because the Bulk Sale Agreement effects an out of court arrangement resulting in an equitable distribution to creditors, (iii) dismissal is in the best interest of creditors because the bulk sale is a less expensive out-of-court arrangement which best serves all interests in this case and (iv) the appointment of a trustee will yield no benefit to creditors.

### Conclusion

We grant Alleged Debtor's motion to dismiss this involuntary case.

SETTLE ORDER AND JUDGMENT.